W. S., Petitioner

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 8, 2005.

Decided Sept. 9, 2005.

William Smith, petitioner, pro se.

No appearance entered on behalf of respondent.

Wendy Kobee, Pittsburgh, for intervenor, Allegheny County Children, Youth and Families.

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge COHN JUBELIRER.

W.S., pro se, petitions for review of the Final Order on the Merits issued by the Secretary of the Department of Public Welfare (DPW), denying W.S.'s request to expunge an indicated report of child abuse for physically abusing his daughter, J.S. DPW upheld an order entered by the Bureau of Hearings and Appeals (BHA) adopting the recommendation of the Administrative Law Judge (ALJ). On appeal, W.S. asserts, *inter alia*, that the

1. 23 Pa.C.S. §§ 6301–6385.

2. The BHA is the ultimate fact finder in expungement proceedings, with the authority to make credibility determinations. *See J.B. v.*

ALJ's decision was unsupported by competent and substantial evidence under the Child Protective Services Law (Law).[1] Essentially, W.S argues that his conduct in disciplining J.S. did not involve a gross deviation from the standard of care that a reasonable person would use in similar circumstances and, therefore, does not constitute abuse.

■ On January 13, 2003, the Allegheny County Children and Youth Services filed with the Childline Registry an indicated report of child abuse naming W.S. as the perpetrator. DPW denied W.S.'s request for expunction of his name from the Childline Registry on June 16, 2003. On December 18, 2003, an administrative hearing was held. DPW submitted a brief to the BHA on February 26, 2004. W.S. did not submit a brief and the record closed on May 7, 2004. (ALJ Adjudication at 1.) On September 17, 2004, the ALJ made 26 findings of fact which the BHA adopted.[2] The following facts were found:

1. The subject child, J.S., is a female born on April 30, 1988, to L.S. (mother) and W.S. (father).

2. W.S. hit the child on the left ear, causing her to fall. Then, while she was on the floor he hit her two more times. W.S. struck the child with an open hand.

3. The injuries significantly impaired the child's physical functioning either temporarily or permanently.

4. The subject child … has a history of school suspensions[.]

5. J.S. admitted that she had been having trouble in school which upset [W.S.].

*Dep't of Pub. Welfare,* 824 A.2d 342, 344 (Pa. Cmwlth.2003), *pet. for allowance of appeal denied,* 575 Pa. 689, 834 A.2d 1144 (2003).

6. [W.S.'s] initial response was to yell at her and restrict her use of her computer, stereo and V.C.R.

7. On November 18, 2002, J.S. lied to her parents about attending swimming practice. She went to a friend's house instead. She did this because she did not want to be confronted by her parents about a bad report card.

8. [W.S.'s] reaction to this deception was to slap J.S.'s ear two to three times.

9. J.S. was standing as W.S.'s first slap made contact with J.S.'s head.

10. J.S. was sitting on the ground when subsequent slaps made contact with her ear.

11. The next day J.S. was seen by Dr. Gloria Kasey and complained of a bruised and swollen ear and difficulty hearing.

12. J.S. had faint bruising on the right forehead with superficial linear abrasion, redness and soft tissue swelling, tenderness extending to the left temporal area, bruising to the left ear, swelling to the left ear, and bruising and tenderness behind the left ear.

13. J.S. also had a 20 decibel loss of hearing in the left ear.

14. Within one week, on November 26, 2002, the child's hearing was still muffled, but there was no swelling on her ear and a small bruise remained inside her ear.

15. Another audiogram was done which showed that the hearing had improved to almost normal shortly thereafter.

16. On December 12, 2003, another audiogram was performed and the child's hearing was normal.

17. The child attended school after the incident and did not have any difficulty in hearing her teachers.

18. The summer before the alleged abuse, [W.S.] discovered that J.S. had a boy in her bedroom and saw a male figure fleeing from the home.

19. J.S. was fully aware that boys were not allowed in her home when her parents were not present.

20. [W.S.] was summoned to the child's school because Administrators discovered that the child had condoms in her purse.

21. [J.S.] got involved in fights with other students, did not keep up with school work, was perpetually late for class, and was suspended from school because of her poor grades.

22. [J.S.] acknowledged that her behavior was a disappointment to her parents.

23. [J.S.] testified in this matter.

24. Testimony of both [J.S.] and of [W.S.] were credible.

25. On January 12, 2003, Allegheny County CYS filed an indicated report of child abuse against [W.S.].

26. The appeal was filed on July 24, 2003.

(Findings of Fact (FOF) ¶¶ 1–26) (citations omitted). The ALJ noted that the testimony of W.S. and J.S. was consistent that W.S. "struck [J.S.] and that she sustained scrapes from the center of her forehead to the left side. When [W.S.] hit [J.S.], she fell, and then [W.S.] hit her two more times." (ALJ Adjudication at 6.) Additionally, the ALJ noted that the testimony of J.S.'s treating physician, Dr. Kasey, was equally unequivocal that she found bruising and contusions to the soft ear tissue, which "significantly impaired [J.S.'s] physical functioning" and caused swelling of [J.S.'s] ear for one week. *Id.*[3] The ALJ

---

**3.** We note that the ALJ made findings of fact that were inconsistent with his analysis. For example, in finding of fact 17, the ALJ found that after the incident, the child did not have

noted that a modicum of corporal punishment is permitted in this Commonwealth, but only if it does not cause a serious physical injury by impairing a child's physical functioning, either temporarily or permanently. *Id.* at 7. The ALJ concluded that there was substantial evidence of temporary physical impairment of J.S.'s left ear, and that W.S. was criminally negligent in slapping J.S. because he should have been aware of the substantial and unjustifiable risk that his actions posed. *Id.* Accordingly, the ALJ recommended that his appeal be denied.

On September 30, 2004, the BHA adopted the ALJ's Recommendation in its entirety. Subsequently, W.S. filed a Petition for Reconsideration, which was granted by the Secretary of DPW on November 8, 2004. On December 29, 2004, the Secretary of DPW, after reconsidering the order of the BHA, entered a Final Order on the Merits upholding the order of the BHA. This appeal ensued.[4]

 W.S. argues that the ALJ's decision not to expunge his name from the Childline *Registry* was an error of law and not supported by substantial evidence. Specifically, W.S. contends that the act of slapping J.S. did not amount to criminal negligence, and that the evidence the ALJ impermissibly relied upon was hearsay. In an expungement case, the county agency bears the burden of proving that the actions of the perpetrator constitute child abuse within the meaning of the Law. *A.B.*

*v. Dep't of Pub. Welfare,* 869 A.2d 1129, 1131 n. 2 (Pa.Cmwlth.2005). The county's evidence must outweigh any contrary evidence. *Id.*

The Law defines child abuse, in pertinent part, as "[a]ny recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age." 23 Pa.C.S. § 6303(b)(1)(i). Serious physical injury is defined as an injury that either "causes a child severe pain," or "significantly impairs a child's physical functioning, either temporarily or permanently." 23 Pa.C.S. § 6303(a). However, it is well established in this Commonwealth that parents are permitted to use corporal punishment as a means of discipline. *See P.R. v. Dep't of Pub. Welfare,* 569 Pa. 123, 801 A.2d 478 (2002). Our Supreme Court granted allocatur in *P.R.* because it acknowledged that there are competing objectives which have to be balanced in applying the Law. Parents must be permitted, in fact encouraged, to discipline their children, even though this may, at times, result in the administration of corporal punishment. At the same time, however, the Law must protect children from abuse. Balancing these objectives in distinguishing between accidental injury and abuse can, in some cases, be very difficult. In *P.R.,* the Supreme Court set out the test for making that distinction; in order to prove abuse, DPW is required to show, through substantial evidence, that the injury resulted from *criminal negligence.* *Id.* at 137–38,

---

any trouble hearing her teachers. However, he later states that "the child ... had difficulty in hearing her teachers...." (ALJ Adjudication at 6.)

4. Our review in expunction proceedings is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative

Agency Law, 2 Pa.C.S. § 704; *E.D. v. Dep't of Pub. Welfare,* 719 A.2d 384, 387 (Pa.Cmwlth. 1998). Substantial evidence, for purposes of child abuse expunction proceedings, is defined as "evidence which so preponderates in favor of a conclusion that it outweighs, in the mind of the factfinder, any inconsistent evidence and reasonable inferences drawn therefrom." *E.D.,* 719 A.2d at 387 (internal quotation omitted).

801 A.2d at 486–87. The legislature has defined criminal negligence as follows:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstance known to him, involves a *gross deviation from the standard of care that a reasonable person would observe in the actor's situation.*

18 Pa.C.S. § 302(b)(4)(emphasis added).

In *P.R.*, the mother used a belt to administer corporal punishment to her daughter in order to discipline her for writing on the walls. *Id.* at 126, 801 A.2d at 480. The child was attempting to evade the blows from the belt when she was struck in the eye by the belt buckle and was subsequently hospitalized. *Id.* The mother admitted to the facts leading up to the injury and responded with concern for her child. *Id.* at 127, 801 A.2d at 480. The child believed the injury was an accident, the child was not afraid of her mother, and there were no signs of previous abuse or neglect. *Id.* The DPW report concluded that child abuse was indicated, but no further action was anticipated. *Id.* Based on these facts, the Supreme Court concluded that DPW did not present substantial evidence to sustain a finding of child abuse. *Id.* at 138, 801 A.2d at 487. The Court stated that one can question the use of a belt with a buckle in administering a spanking, but qualified that statement by stating that "in most circumstances the decision to use a belt that bears a buckle cannot be viewed, as a *gross deviation* from the standard of care *a reasonable parent would observe in the same situation.* Without substantial proof that this unusual injury was more than the regrettable result of corporal punishment, we cannot allow the oddity of the result itself to presuppose the element of unjustifiable risk that would lead to the finding of criminal negligence." *Id.* (emphasis added).

This Court was faced with a similar situation in distinguishing between abuse and accident after parents administered corporal punishment to their child in *J.B. v. Dep't of Pub. Welfare,* 824 A.2d 342 (Pa.Cmwlth.2003), *pet. for allowance of appeal denied,* 575 Pa. 689, 834 A.2d 1144 (2003). There, this Court reversed the order of the BHA and held that the evidence presented was insufficient to support a finding of child abuse and, accordingly, granted expungement. *Id.* at 345. The evidence was that the parents spanked their child with a plastic spoon on his buttocks about 13 times in order to discipline him for removing cards from a family member's bedroom which led to a three hour argument in which the child became physically aggressive and verbally abusive. *Id.* at 343–44. Although the child's buttocks were sore and bruised, which caused some difficulty sitting, the evidence failed to support a finding of "severe pain" or "substantial impairment." *Id.* at 345. Moreover, the evidence revealed that the spanking was not done with malice, evil intent or in the heat of an emotional attack. *Id.* at 345. Instead, the father first tried to diffuse the situation by removing the child to another area in the home that was less chaotic so the child would calm down. *Id.* at 343. The parents gave the child the choice of either being spanked or being placed outside of the home; the child chose to be spanked. *Id.* The parents responded with a "strong level of discipline" because they were trying to show that this behavior could not happen again and, at the same time, wanted the discipline to have an impact on the child. *Id.* at 344. At no point did the

parents intend to hurt the child. *Id.* at 345. Based on the evidence, this Court held that the record did not reveal substantial evidence that the child's injury was more than "the normal regrettable result of measured well intentioned corporal punishment." *Id.*

Although this case is a difficult one, we believe that it is more like *P.R.* and *J.B.* and that DPW did not present substantial evidence that J.S.'s injury resulted from criminal negligence. DPW presented the testimony of J.S., W.S., and the treating physician, Dr. Kasey, among others. J.S. testified that she is currently in tenth grade and that during her ninth grade year she had problems at school where she was given numerous detentions, three suspensions, and was disciplined for fighting with other students. (Test. at 47, 49–52.) She admitted that her grades are poor, she lies to her parents, and has skipped swimming practice to be with her friends without her parents' knowledge. *Id.* at 57–58, 63. J.S. testified that on the day of the incident, her father confronted her about: a recent suspension that she had not told him about, a report card that her parents had requested and that she had for two weeks but lied to her parents about receiving, and her lying about attending swimming practice after school. (Test. at 59.) J.S. stated that she had a "bad attitude" with her father and said something "smart." *Id.* at 59. At that point, W.S. hit her with an open hand two to three times on the left ear. *Id.* at 60. She testified that she was scared because her father has never done anything like that before. *Id.* J.S. testified that after W.S. slapped her, he told her to stay at her grandmother's house and that they would talk about it later. *Id.* at 61. When questioned about other means by which W.S. has disciplined her in the past, she stated that he had not hit her, but would sit her down and either talk to her or yell at her because he would be upset and wanted her to better herself. *Id.* at 53–54. She admitted that she let her father down. *Id.* at 54. J.S. testified that she did not complain about her ear hurting,[5] did not take any aspirin for pain, and attended school the next day and had no problems hearing her teachers. *Id.* at 65–66. She further testified that W.S. has not hit her since the incident and that she is not afraid of him. *Id.* at 66.

W.S., likewise, corroborated J.S.'s testimony about her misconduct and defiance. He stated that he had not known about the suspension until he received a phone call from the school that day. (Test. at 94.) At that time he also discovered that J.S. had received the report card he and his wife were waiting for, and lied about it. *Id.* at 95. After discussing the situation with his wife, they decided to wait until J.S. came home from school to discuss it and not to interrupt her school day. *Id.* However, she did not return home at the end of the day and, instead, went to a friend's house. *Id.* at 96. Her mother called her, picked her up, and took her to her grandmother's house where W.S. met them. *Id.* W.S. testified that he has tried disciplining J.S. through restrictive measures and has never used physical discipline with her except when she was a toddler where he would "give her a couple swats on the behind" if she did something wrong. (Test. at 93–94.) He explained that after he hit J.S. he was very upset because he had never hit her like that

---

**5.** In fact, J.S. testified that she did not notify her school about the incident, but rather, a friend "went down and told [Mr. Taylor, a social worker] that I had a bruise on my ear and [the friend] thought I … got in a fight with someone else and [the friend] wanted to know about the fight. So [the friend] went down to [Mr. Taylor] and [Mr. Taylor] came and got me." (Test. at 68.)

before. *Id.* at 97. W.S. went on to state that the incident took about ten to fifteen seconds and he did not see any blood or cuts on J.S. *Id.* at 98. After the incident, he talked to his daughter about what happened and apologized, but "wanted to keep the respect as a parent." *Id.* He stated that he has not used any form of physical discipline with J.S. since that time. *Id.*

Dr. Kasey testified at the hearing about the injury to J.S. She stated that she examined J.S. on November 19, 2002 and, at that time, J.S. was "complaining that her ear was bruised and swollen and she was having trouble hearing." (Test. at 38.) W.S. argues that this testimony by Dr. Kasey was impermissible hearsay evidence, and should not have been admitted. However, this Court has held that under the relaxed evidentiary standards applicable to administrative proceedings, hearsay evidence, admitted without objection, can be used to support a finding of fact if it is corroborated with other evidence. *See Anderson v. Dep't of Pub. Welfare,* 79 Pa.Cmwlth. 182, 468 A.2d 1167, 1169 n. 5 (1983). To corroborate this hearsay evidence, Dr. Kasey testified that upon examination, she observed the following on J.S.'s face: a faint bruise on the right forehead; a superficial linear abrasion with redness and some soft-tissue swelling; tenderness that extended to the left temporal area; bruising on the outside of the left ear; and, the inside of the left ear was

swollen and tender. (Test. at 38–39.) Dr. Kasey performed an audiogram to evaluate J.S.'s complaint of hearing loss and, according to that test, J.S. had about a 20 decibel hearing loss. *Id.* at 39. However, when questioned about what the percentage of her hearing loss was, Dr. Kasey stated that she could not "really give that information ... [because she was] not an ear specialist," and then opined that it was about ten to twenty percent. *Id.* at 40. One week later, at a follow-up examination, Dr. Kasey testified that J.S. complained that her hearing was still muffled, and noted that her facial abrasions had all resolved. *Id.* Dr. Kasey noted a small bruise on the inside of her ear and, upon conducting another audiogram, Dr. Kasey testified that J.S.'s hearing was "now almost normal." *Id.* at 41. Finally, DPW submitted two reports from Child Protective Services which corroborate the oral testimony given by J.S., W.S. and Dr. Kasey. *See* Ex. C–1, C–2.[6]

This evidence, found credible by the Secretary of DPW, does not support DPW's denial of W.S.'s request to expunge his name from Childline Registry. At the time of the incident, W.S. was frustrated because of his daughter's continuous misconduct and, in disciplining her, did not intend to inflict injury. The evidence of record reveals that W.S. slapped J.S. two to three times with an open hand, after numerous attempts to discipline her with-

---

**6.** W.S. argues that the "State [did not] produce any sworn statements or witnesses that wrote the exhibits used as evidence, or interviewed W.S. or J.S. prior to the court date that could accurately support the State's evidence, other than the physician that stated she was not a hearing specialist and was uncertain in regard to the accuracy of her information and the validity of her testimony[.]" (W.S. Br. at 7.) We do note that the case worker who wrote the Children Youth Services reports was not present at the hearing and the case worker's supervisor testified

as to those reports. However, W.S., J.S. and Dr. Kasey all testified before the ALJ and their testimony was consistent with the Children Youth Services reports that J.S.'s injury to her ear caused temporary hearing loss of about 20 decibels. (*See* Ex. C–1 at 2; C–2 at 3; Test. at 39.) In addition, Dr. Kasey has been J.S.'s physician for several years and, while she is not an "ear specialist," she conducted a full examination of J.S. and her testimony was rendered credible by the finder of fact.

out resorting to physical contact. Although the slapping resulted in a temporary loss of hearing, W.S.'s conduct did not rise to the level of criminal negligence and cannot be viewed as a gross deviation from the standard of care a reasonable parent would observe in the same situation. The evidence shows that W.S. is a concerned parent who has tried everything in his means to control his child. While W.S. was upset at the time he slapped J.S., he maintained self-control by walking away from the situation after he made physical contact with her the second or third time. The fact that J.S. experienced a temporary hearing loss does not allow us to presuppose an unjustifiable risk that would lead to the finding of criminal negligence.[7] The injury J.S. received as a result of corporal punishment was an accident, and a "re- grettable result of corporal punishment" rather than abuse. *J.B.*, 824 A.2d at 345; *see also P.R.*, 569 Pa. at 138, 801 A.2d at 487.

Accordingly, we must reverse the decision of the Secretary of DPW.

### *ORDER*

**NOW,** September 9, 2005, the order of the Department of Public Welfare in the above-captioned matter is hereby **reversed.**

7. W.S. also argues that the ALJ erred in not reading his brief in support of expunction, and that it was an error of law not to allow a second hearing on the merits. However, because of our disposition in this case, we need not reach these issues.