IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J. S.,                              :
                    Petitioner     :
                                   : **CASE SEALED**
            v.                     :
                                   : No. 1772 C.D. 2017
Department of Human Services,      : Argued:  December 13, 2018
                                   :
                    Respondent :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY JUDGE WOJCIK                    FILED:  November 15, 2019


            J.S. (Father) petitions for review of the November 3, 2017 order of the

Department of Human Services (Department), Bureau of Hearings and Appeals

(BHA), which adopted the recommendation of an administrative law judge (ALJ)

denying Father's appeal to expunge an indicated report of child abuse.  We reverse.


## I. Facts and Procedural History

            Father and Je.S. (Mother) are the biological parents of Ja.S. (Child).[1]

Father and Mother divorced in 2013 and share custody of Child.  In November 2015,

Child was exhibiting behavior problems, and he was asked to leave the daycare

center he attended.  F.F. No. 2.  Father and Mother jointly decided not to return Child

to that center.  F.F. No. 3.  Child's behavior issues continued, and Father "tried

everything" to correct Child's behavior.  F.F. No. 4.  Father had discussions with

---

[1] Child was born in May 2011 and was four years old in February 2016, when the incident
of alleged child abuse occurred.  Finding of Fact (F.F.) No. 1.

Child about his conduct and took away privileges and other things. *Id.* Father gave Child a stress ball to manage his anger, and Father tried various de-escalation techniques recommended by a school psychologist. *Id.*; Reproduced Record (R.R.) at 252a-53a.

Father and Mother enrolled Child at a new daycare, where Child's behavior problems persisted. On February 3, 2016, Father received a call and an email from the daycare informing him that Child had been misbehaving and needed to be picked up. F.F. No. 8. The email stated that Child's misconduct included four specific behaviors: disrespecting his teachers; climbing on furniture; taking toys away from and being aggressive toward another child by trying to slam the child's head into the ground and laughing; and "potty talk." F.F. No. 9. Father picked Child up from the daycare shortly after 3:00 p.m. F.F. No. 8.

When they arrived home, Father sent Child to his room. Father decided to try corporal punishment, a strategy his own parents had used, to help modify Child's behavior. F.F. No. 10. Father had never spanked Child before; on his way to Child's room, Father smacked his own leg multiple times "to make sure he did not hit [Child] too hard." F.F. Nos. 11, 43. Father pulled Child's outer pants down, read Child the email, bent Child over his knee, and hit Child with an open palm four times on his buttocks; afterward, Father hugged Child and they both cried. F.F. No. 10.

At approximately 3:40 p.m., Father took Child with him to basketball practice at the school where Father is an assistant coach. F.F. No. 12. A few minutes after they arrived, Father's wife, who is employed at the same school as Father and Mother, picked Child up. F.F. No. 13. Later that evening, when Father's wife gave Child a bath, Father noticed red marks on Child's buttocks. F.F. No. 14. Although

2

Child did not complain of discomfort to Father or Father's wife, Father called his parents. F.F. No. 15. Based on his parents' advice, Father applied ice to Child's buttocks that night and the following day; Child protested that the ice was cold. F.F. No. 16. Other than not attending daycare on Thursday and Friday, February 4-5, 2016, Child went about his normal activities those days, and he rode his bike on Saturday, February 6, 2016. F.F. No. 17.

Father did not contact Mother to advise her that he spanked Child or that he kept him home for two days. F.F. No. 18. Mother and Father "have a somewhat acrimonious relationship, do not communicate well and usually have no contact with each other when one of them has custody of [Child]." F.F. No. 19.

Child returned to Mother's home on Monday, February 8, 2016. F.F. No. 20. When Child undressed for a bath, Mother was shocked to see big bruises on his buttocks. F.F. No. 21. Child ran to his room and said that Father hit him so hard that it hurt; he wanted to scream and yell and hit Father back; and Father had put ice on his bottom. F.F. No. 22. Mother took photographs of Child's buttocks that evening. F.F. No. 23. She recalled that Child went about his normal activities that night and had no complaints of pain or any issues with sitting. F.F. No. 24.

On the night of February 8, 2016, the York County Office of Children, Youth and Families (CYF) received a referral alleging that Child had been physically abused by Father on February 3, 2016, when Father spanked Child. R.R. at 196a; 5/31/17 Ex. C-5. CYF intake caseworker Irene Franzis initiated an investigation by interviewing Mother and Child on February 9, 2016. She then contacted Detective Donald Hopple of the York Area Regional Police Department, who assisted CYF with investigations. R.R. at 200a. Detective Hopple interviewed Father on February 10, 2016. R.R. at 43a. Thereafter, Detective Hopple forwarded the case to an

3

assistant district attorney (ADA), who directed him to file a citation against Father for harassment based on the spanking incident.[2] R.R. at 46a.

A month later, on March 9, 2016, Mother sought a Protection from Abuse order (PFA) based on the February 3, 2016 spanking incident. F.F. No. 29. Custody litigation was ongoing at the time; the PFA was dismissed when Child's parents entered into a new custody agreement. F.F. No. 30. There was no disruption to the custody or visitation schedule as a result of the allegations or the PFA. F.F. No. 31.

As part of CYF's investigation, Ms. Franzis interviewed Father, his wife, and Child; spoke with Child's play therapist; consulted with law enforcement; attended the PFA hearing; reviewed Mother's photographs of Child's buttocks; took a photograph of Child's buttocks and observed brownish-green markings; noted that Child did not seem to be fearful of Father; and received no information that Child suffered any impairment of functioning.[3] F.F. No. 28.

On March 15, 2016, CYF issued an indicated report of physical child abuse against Father to the ChildLine & Abuse Registry.[4] On March 21, 2016, Father pled guilty to a summary offense citation of harassment. On or about April 12, 2016, Father appealed the indicated report and requested an expunction hearing.

---

[2] Harassment is defined as the "intent to harass, annoy or alarm another, the person strikes, shoves, kicks, or otherwise subjects the other person to physical contact." Section 2709 of the Crimes Code, 18 Pa. C.S. §2709.

[3] Neither parent sought medical attention for Child's bruises. F.F. No. 27.

[4] Section 6331(3) of the Child Protective Services Law (Law) states in part, "There shall be established in the department a Statewide database of protective services, which shall include . . . (3) Indicated and founded reports of child abuse." 23 Pa. C.S §6331(3).

On April 14, 2016, CYF changed the status of its report to founded,[5] based on Father's guilty plea of harassment.

A hearing was held in June 2016 for the limited purpose of determining whether CYF properly amended the report. On August 12, 2016, an ALJ recommended that Father's appeal be sustained and that the founded report of child abuse be expunged. Certified Record, Item No. 5. The BHA adopted the ALJ's findings by August 23, 2016 order.

Thereafter, CYF filed an application for reconsideration with the Secretary of Human Services (Secretary) and requested a hearing on the former indicated report of child abuse. The Secretary granted reconsideration. On February 28, 2017, the Secretary issued an order upholding the expungement of the founded report and remanding the matter to the BHA for a hearing on the merits of Father's appeal of the indicated report.

The ALJ held a hearing on May 3, 2017. H.M., Child's daycare teacher, testified that Child had been in the daycare program since November 30, 2015. She described Child as having ongoing behavioral issues, including verbal and physical aggression. H.M. said that on February 3, 2016, she notified Child's parents that Child was misbehaving and needed to be picked up from daycare. She stated that Child was verbally abusive to the teachers, was taking toys from other children and at one point tackled another child. R.R. at 23a-26a.

Detective Hopple testified that he contacted Father on February 10, 2016, and met with him that morning. Father explained that he received an email

---

[5] A founded report of child abuse is made where, *inter alia*, there has been a judicial adjudication (including the entry of a guilty plea or a plea of nolo contendere or a finding of guilt to a criminal charge) that is based on a finding that a subject child has been abused and involves the same factual circumstances involved in the allegation of abuse. Section 6303 of the Law, 23 Pa. C.S. §6303; *J.M. v. Department of Public Welfare*, 94 A.3d 1095, 1099 (Pa. Cmwlth. 2014).

stating that Child was acting very aggressively with other children. Father said everything he had tried to improve Child's behavior, such as timeouts and removal of privileges, had failed. Father admitted that he spanked Child. He described to Detective Hopple how he first hit himself on the leg to see how hard he might be spanking his son. Detective Hopple testified that Father felt terrible and expressed remorse for spanking Child. He said Father reported being shocked when he saw the marks on Child's bottom. Father concluded that the spanking was obviously a mistake and said that he "did overdo it." R.R. at 45a. Detective Hopple said he suggested that Father take parenting classes and they discussed that for a while before finishing the interview. R.R. at 43a-46a.

Child was five-and-a-half years old at the time of the hearing. Child testified that he liked kindergarten, playing with his dad, and football. When asked what he would like to do on his upcoming birthday, Child said he would like to wrestle with his dad. Child said that when he gets in trouble, he normally is sent to his room. He remembered that Father once spanked him, but he did not recall why. Child testified that Father hit him with an open hand on his bottom and it really hurt. He said it happened just one time in his room and that Father struck him just once. He denied that anybody gave him ice and initially did not remember what he did afterwards or whether it hurt the next day. R.R. at 67a-90a.

On cross-examination, Child testified that after the spanking, Father took him to basketball practice. Child said he sat and watched practice and was able to sit and ride his bike and do other activities. Child subsequently testified that he did not remember what he did the day after he was spanked or where he was before he arrived home with his dad. R.R. at 92a-99a.

6

Responding to questions from the ALJ, Child testified that he remembered hurting himself when he was about four years old and fell off his bike. He was wearing shorts and his knees hit rocks on the ground. Child said it hurt but he could not say how much. When the ALJ asked Child if the spanking was the worst pain Child ever felt, he said yes. Then he answered that his bottom did not hurt at all while he was sitting on his bed after the spanking. Immediately thereafter, Child said that he cried for a long time because it hurt a lot. He next stated that his bottom did not hurt when he was sitting in the basketball stands. Child concluded his testimony by stating that he "felt good" about both of his parents and that no one told him what to say at the hearing. R.R. at 101a-11a.

Mother testified that under the parents' custody arrangement, Child was with her on Mondays and Tuesdays, with Father on Wednesdays and Thursdays, and the parents alternated custody on weekends. Mother explained that she saw the February 3, 2016 email from daycare, but Father picked Child up because it was his custodial day.

Mother stated that she picked Child up from daycare in the late afternoon on February 8, 2016. She said she first noticed something was wrong at approximately 7:00 p.m., when Child was getting ready for a bath, and she saw big bruises on his bottom. Mother described Child as ashamed and said he covered his bottom and ran back to his room. Child told her that Father had hit him and that it hurt so bad he wanted to yell and scream and hit him back. Child also said that it was his fault. Mother testified that she took pictures of Child's bottom on the evening of February 8 and again the following day. Mother noted that Child returned to his ordinary activities on February 8 and February 9, 2016. R.R. at 121a-28a, 130a-44a.

Mother testified that she allowed Father to have custody of Child on the following Wednesday and Thursday because she believed he was remorseful. She said she did not call him immediately afterward and has never discussed the incident with him. Mother stated that she had no motivation to cause Father to lose his job as a teacher and said that she tried very hard to keep the situation out of their school. She said that she eventually told a school administrator what was happening on the advice of her attorney. R.R. at 145a-57a, 169a-70a.

Ms. Franzis testified that she made a finding of child abuse based on Child's age, Child's report that Father spanked him and it hurt, the visible bruising on Child's bottom five and six days after the spanking, conversations with Father and his wife, the fact that ice had been applied to Child's bottom, and the fact that Child cried. Ms. Franzis identified the photographs Mother had shown her and said she had considered those as well. However, Ms. Franzis acknowledged that when she viewed Child's bottom on February 9, 2016, "there [were] possibly some marks," but she did not see bruises. R.R. at 218a-19a. She added that she observed redness on Child's bottom that could have been caused by sitting on the floor. R.R. at 198a, 212a-13a, 219a, 227a.

Father testified that after using multiple alternatives, such as loss of privileges and de-escalation techniques, without success, he decided to try corporal punishment. Father stated that his parents had used this strategy when he was a child, and he believed it might help curb Child's misbehavior. He testified that he wanted to discipline Child, not hurt him. Father described hitting his own thigh on his way to Child's room to make sure he did not spank Child too hard. Father stated that he spanked Child four times, once for each infraction identified in the email. Father explained that he bent Child over his knee, hit Child's "upper left butt cheek,

8

lower left butt cheek, upper right butt cheek, lower right butt cheek," to avoid spanking Child twice in the same area. Afterward, he and Child hugged, they cried, and then it was over. Father testified that when he saw Child's bare bottom that evening, he did not observe any bruising, only red marks, which were not raised. Father stated that "from the bottom of [his] heart, [he] never expected there to even be a mark based on how hard that [he] spanked [Child's] butt." R.R. at 255a-57a, 259a, 272a-74a, 278a.

Father said that he kept Child home from daycare on February 4 and February 5 to give both Child and daycare a fresh start. He explained that he and Mother had agreed in the past to keep Child home from daycare after disciplinary problems so Child could regroup. When asked if keeping Child home after the spanking was not suspicious, Father said that Child uses the bathroom on his own and no one at the daycare would have reason to see Child's bottom. Father further testified that he did not inform Mother of the spanking or Child's absence from daycare because Child was not injured and did not complain of pain. Father explained that he and Mother got along for a period after their divorce, but by February 2016, their communication was at a minimum. R.R. at 279a-92a.

The ALJ found the testimony of each witness credible[6] and issued the findings of fact summarized above. The ALJ began her analysis by noting the relevant statutory provisions. Section 6303(b.1) of the Law states that "[t]he term 'child abuse' shall mean intentionally, knowingly or recklessly doing any of the following: . . . Causing bodily injury to a child through any recent act or failure to act." 23 Pa. C.S. §6303(b.1). Section 6303(a) of the Law defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa. C.S. §6303(a).

---

[6] F.F. Nos. 35-39, 41-43.

The ALJ determined that Father "exercised poor judgement and made a bad decision." R.R. at 320a. Although the ALJ credited Father's testimony, she concluded that Father's conduct was a gross deviation from the standard of care that a reasonable person would observe in the same situation and amounted to "recklessness, or criminal negligence." R.R. at 320a-21a. The ALJ stated Father should have known that it was "practically certain" that his spanking Child "would result in injuries to [Child]." R.R. at 321a.

Ultimately, the ALJ's decision rested on her determination that Child suffered "substantial pain." In making that determination, the ALJ repeatedly emphasized that bruises could be seen on Child's buttocks five days after the spanking. R.R. at 320a-24a.

> [B]y definition, corporal punishment induces pain. [Child] credibly testified how [sic] when [Father ] spanked him on his bottom with his open hand it "really hurt" and he cried for a long time and then they went to basketball practice. [Child] relayed how [Father] applied ice to his buttocks. Ice was applied not just on the night of the spanking but the next day as well. While [Child] did not complain to either parent that he experienced pain from either sitting around or riding his bike at any point after [Father] utilized corporal punishment[,] and there was no medical testimony or evidence since neither parent took [Child] to see a doctor or administered medication for pain, the photographs of [Child's] buttocks are particularly compelling.

R.R. at 321a. The ALJ relied on reddish, brownish bruising, apparent five days after the spanking, Child's testimony that the spanking "really hurt," Father's application of ice to Child's buttocks over two days, Father's failure to take Child back to daycare, and Father's failure to inform Mother of the spanking to conclude that Child suffered substantial pain. *Id.* at 321a-22a. The ALJ further observed:

10

> There is no indication that [Child] was not able to go about his normal activities. There was, however, testimony from [Child], [Mother] and the caseworker, and documentary evidence, *specifically photographs, which showed bruising and discoloration over the majority of [Child's] buttocks five (5) days after [Father] utilized corporal punishment to discipline [Child]. . . .*

R.R. at 324a (emphasis added).

The ALJ reasoned as follows. Intentionally, knowingly, or recklessly causing bodily injury to a child constitutes child abuse. 23 Pa. C.S. §6303(b.1). "Bodily injury" is defined as impairment of physical condition or substantial pain. 23 Pa. C.S. §6303(a). The testimony of Child, Mother, and Ms. Franzis, along with the photographs showing bruising and discoloration five days later, supports a finding that Child experienced substantial pain. R.R. at 324a. While the Law recognizes a parent's right to use reasonable force for the purpose of discipline, in this case Father's actions went beyond the use of reasonable force. *Id.*

> First, [Father's] actions were reckless as they rose to the level of criminal negligence in that there was substantial evidence that [Father] acted negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation. [Father] admitted to "overdoing it" when he disciplined [Child]. Reasonable persons, parents, in [Father's] position who had unsuccessfully tried to correct their 4-year-old's poor behavior would likely resort to spanking [Child] with an open hand with the child's pants down but not as hard as [Father] did. [Father] realized that a substantial and unjustifiable risk would result from his conduct. [The Department] proved that [Father's action] in hitting [Child] with an open palm was knowing. [The

11

Department] also showed by substantial evidence that [Father] was aware that his conduct was of that nature or that such circumstances exist or that his conduct would have resulted in [Child] sustaining bruising to his buttocks.

R.R. at 324a. We interpret the above as a determination that Father's conduct was criminally negligent because Father knowingly disregarded a substantial and unjustifiable risk, which was that his spanking Child would cause Child substantial pain.

The ALJ concluded that the Department satisfied its burden to support the indicated report of child abuse with substantial evidence and recommended that Father's appeal of the indicated report be denied.

Father appealed. The BHA denied his appeal and adopted the ALJ's recommendation in its entirety.

## II. Discussion

### A. Res judicata

On appeal,[7] Father first argues that CYF failed to present substantial evidence establishing child abuse at the first hearing and that the doctrine of *res judicata* barred a second hearing on the same issue.

> *Res judicata* encompasses two related, but distinct principles: technical *res judicata* and collateral estoppel. Technical *res judicata* provides, where a final judgment on the merits exists, a future lawsuit on the same cause of action is precluded. Collateral estoppel acts to foreclose litigation in a subsequent action where issues of law or fact were litigated and necessary to a previous judgment.

---

[7] Our scope of review is limited to determining whether the record supports the necessary findings of fact, whether constitutional rights were violated, or whether errors of law were made. *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 225 n.2 (Pa. Cmwlth. 2010).

> [Where applicable], collateral estoppel bars a subsequent lawsuit where (1) an issue decided in a prior action is identical to one presented in a later action; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4), the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*C.J. v. Department of Public Welfare*, 960 A.2d 494, 499 (Pa. Cmwlth. 2008) (citations omitted).

In response, the Department correctly observes that once CYF amended the status of the report to founded, the only issue that could be considered on appeal was whether Father's guilty plea to the harassment charge supported a founded report of child abuse. *See R.F. v. Department of Public Welfare*, 801 A.2d 646, 649 (Pa. Cmwlth. 2002) (holding that an appeal of a founded report was permissible where it was not a collateral attack on the underlying adjudication but only challenged whether the plea was one upon which a founded report could be based). Consequently, the BHA's prior determination did not consider evidence, facts, or issues related to allegations in the indicated report.

### B. Substantial evidence

Father next argues that CYF failed to support the indicated report of child abuse with substantial evidence. Section 6303 of the Law states that an indicated report of child abuse is made if an investigation by the Department or a county agency determines that "substantial evidence of the alleged abuse by a perpetrator exists based on any of the following: (i) Available medical evidence[;] (ii) The child protective service investigation[;] (iii) An admission of the acts of abuse by the perpetrator." 23 Pa. C.S. §6303.

13

In making this argument, Father notes that no medical evidence was offered to establish either injury or pain. He notes that while Mother took photographs, she did not take Child to a medical provider. Father also challenges the results of CYF's investigation. He emphasizes Ms. Franzis's admissions that she did not see any bruises on March 1, 2016; she did not note any discoloration on her contact summary sheet; and the bruising she referenced in the explanatory section of the indicated report was not bruising she personally observed, but was reported by Mother.[8] R.R. at 218a-21a, 225a-27a. Lastly, Father argues that there are no admissions of acts of abuse.

CYF counters that the record includes ample evidence that Father behaved recklessly and caused Child substantial pain. In particular, CYF cites Father's testimony that he practiced striking his leg before hitting Child as an admission that Father knew of and disregarded the likelihood that he would cause

---

[8] Regarding the basis of the indicated report, Ms. Franzis testified as follows:

> Q. [The indicated report] specifically says that [Child] was seen with injuries/bruising several days after the date of that incident. Was that referring to you seeing those bruises or to mother seeing those bruises?
>
> A. That was referring to mother seeing those bruises.
>
> Q. Okay. So you never actually saw those bruises.
>
> A. No.
>
> Q. But yet, you saw [Child] the same day she's saying she saw those bruises?
>
> A. Yes.

R.R. at 227a.

14

Child substantial pain. We cannot agree that the cited testimony, that Father struck himself because he did not want to hurt Child,[9] establishes a knowing or intentional disregard of a likelihood of harm.

CYF relies on "bruises [that were] still visible five days later" as evidence that Child suffered substantial pain. F.F. No. 23. We have held that photographic evidence may support a finding of severe pain,[10] but we also have cautioned factfinders that they lack the expertise necessary to interpret medical evidence. *See, e.g.*, *Zeigler v. Workers' Compensation Appeal Board (Jones Apparel Group, Inc.)*, 728 A.2d 421, 424 (Pa. Cmwlth. 1999) (holding that the workers' compensation judge, "who of course was not qualified as an expert medical witness," impermissibly relied on her own opinion to make findings concerning the medical significance of test results). Although we have yet to similarly caution factfinders in this context, we hold that a factfinder who is not a medical expert exceeds her authority by making what are essentially medical determinations to

---

[9] "I smacked my leg to make sure that I didn't hit him too hard. I didn't want to spank him too hard." R.R. at 256a.

[10] *See S.T. v. Department of Public Welfare*, 962 A.2d 679, 683 (Pa. Cmwlth. 2008). In *S.T.*, the ALJ found:

> [T]he pictures of the subject child's injuries are powerful evidence that the subject child suffered a serious physical injury. They show bruises over much of the child's body. The picture of the extensive bruising from the child's abdomen to his groin is especially graphic. As such, the pictures depict the result of a savage beating that was far removed from any acceptable corporal punishment. In sum, the only conclusion one can draw from these photographs is that the subject child suffered serious pain . . . .

This Court likewise described the photographs as depicting a child with bruises over much of his body as well as cuts and dried blood on his right leg. We held that from the photographic evidence, "one can reasonably infer that the injuries caused severe pain." *Id.*

15

support necessary findings of fact. Here, to the extent the ALJ *assumed* a correlation between the *duration of a bruise* and a *degree of pain*, the ALJ erred.

**C. Section 6304(d)**

Finally, Father argues that the Department failed to consider his right as a parent to use corporal punishment to discipline Child. In Section 6304(d) of the Law, added by the Act of December 18, 2013, P.L. 1170, the legislature expressly excluded a parent's use of reasonable force as a form of discipline from the definition of child abuse.

Section 6304(d) of the Law states:

> (d) Rights of parents. — Nothing in this chapter shall be construed to restrict the generally recognized existing rights of parents to use reasonable force on or against their children for the purposes of supervision, control and discipline of their children. Such reasonable force shall not constitute child abuse.

23 Pa. C.S. §6304(d). Where the allegation of child abuse involves a parent's administration of corporal punishment for the purpose of disciplining a child, the ultimate question is whether the parent used "reasonable force." *Id.* Notably, the analysis focuses on the parent's conduct rather than the result. *See P.R. v. Department of Public Welfare*, 801 A.2d 478 (Pa. 2002)[11]; *W.S. v. Department of Public Welfare*, 882 A.2d 541 (Pa. Cmwlth. 2005); *J.B. v. Department of Public Welfare*, 824 A.2d 342 (Pa. Cmwlth. 2003).

---

[11] This case was decided under a prior version of the Law that defined "child abuse" using the terms "nonaccidental" and "serious physical injury" rather than "intentionally, knowingly or recklessly" and "bodily injury." However, decisions under the prior law are still helpful to our analysis. *See Allegheny County Office of Children, Youth & Families v. Department of Human Services*, 202 A.3d 155, 165 n.10 (Pa. Cmwlth. 2019).

16

In *P.R.*, a mother used a belt to administer corporal punishment to her six-year-old child after she found the child writing on the apartment walls. The child tried to evade the blows and the belt buckle struck the child's eye. The mother immediately attended to the child's injury and took the child to a clinic. Eventually, the resulting injury required surgery. An indicated report was filed naming the mother as the perpetrator of abuse. The mother's request for expungement was denied based on the hearing officer's determination that the injury was foreseeable. This Court reversed, finding that an intent to harm was required to sustain a finding of child abuse. Our Supreme Court affirmed, but on other grounds.

The Supreme Court recognized the need to balance the competing objectives of protecting children from abuse while maintaining a parent's right to use corporal punishment. The court concluded that the standard that appropriately resolves that tension is criminal negligence. Applying the criminal negligence standard to the facts presented, the Supreme Court stated:

> One can question the wisdom of a parent's decision to use a belt with a buckle attached to administer a spanking. However, in most circumstances the decision to use a belt that bears a buckle cannot be viewed as a gross deviation from the standard of care a reasonable parent would observe in the same situation. *Without substantial proof that this unusual injury was more than the regrettable result of corporal punishment,* we cannot allow the oddity of the result itself to presuppose the element of unjustifiable risk that would lead to the finding of criminal negligence. On the record presented in this case, we cannot conclude that DPW presented substantial evidence to sustain a finding of child abuse.

*P.R.*, 801 A.2d at 487 (emphasis added).

17

In *W.S.*, a teenage child lied to her parents about her whereabouts, her poor report card grades, and her school suspensions. The father disciplined the child by hitting her in the ear several times, causing her to fall. Thereafter, an indicated report of child abuse was filed naming the father as the perpetrator. Evidence presented during an expungement hearing established that the child suffered bruising and contusions to her ear and swelling that significantly impaired her functioning. The child initially had a 20-decibel loss of hearing in her left ear, which improved to a normal level shortly thereafter. The ALJ found that the injuries significantly impaired the child's physical functioning, either temporarily or permanently. The ALJ denied the expungement request, and that decision was upheld by the agency on appeal.

On further appeal to this Court, we recognized the competing objectives discussed by the Supreme Court in *P.R.* "Parents must be permitted, in fact encouraged, to discipline their children, even though this may, at times, result in the administration of corporal punishment." *W.S.*, 882 A.2d at 545. "At the same time, however, the Law must protect children from abuse." *Id.* Upon review, relying on *P.R.* and *J.B.*,[12] we concluded that the agency did not establish that the child's

---

[12] In *J.B.*, a teenage child was behaving aggressively and violently. The child was offered the choice between being spanked or being removed from the home, and the child opted to be spanked. The child removed his jeans and the mother's boyfriend spanked the child with a large plastic serving spoon 10 to 12 times on his bottom while the mother held down the child's wrists. Afterwards, the mother spanked the child's bottom with the spoon three times. The blows to the child's buttocks caused him to experience severe pain and temporary impairment. The next day, the child had trouble sitting, and photographs of the child's bottom showed a series of red, oval-shaped bruising and welts. Thereafter, Blair County Children and Youth Services filed an indicated report of child abuse against the mother and her boyfriend. On appeal, their requests for expungement were denied.

18

injuries resulted from criminal negligence. We described the father as a "concerned parent who tried everything in his means to control his child" before resorting to physical discipline. 882 A.2d at 548. We also noted that while the father was upset when he slapped the child, he exercised self-control by walking away after slapping

---

On further appeal, this Court first found that the record did not support a finding of severe pain or severe impairment. "The testimony revealed that the child had bruises on his bottom and difficulty sitting for a few days. However, there was no mention of 'severe pain,' broken skin, external bleeding or a showing of substantial impairment. The existence of bruises alone [does] not establish proof [sic] of severe pain." *J.B.*, 824 A.2d at 345.

We next concluded that the record did not establish that criminal negligence caused the child's injury:

> The agency also has a duty of showing that criminal negligence caused the injury. [The legislature has defined criminal negligence as follows:]
>
> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.
>
> Petitioner's use of a plastic spoon to administer a spanking to the child did not amount to criminal negligence. In these circumstances the decision to use a plastic spoon to spank a child cannot be viewed as a gross deviation from the standard of care a reasonable parent would observe in the same situation. The record is absent of any malice, evil intent or emotional attack by the actors and does not reveal any substantial evidence that the child's injury was more than the normal regrettable result of measured well intentioned corporal punishment. *The resulting bruises do not allow us to presuppose an unjustifiable risk that would lead to the finding of criminal negligence.*

*J.B.*, 824 A.2d at 345 (emphasis added) (citations omitted).

19

the child's ear for the third time. We explained that the fact that the child "experienced a temporary hearing loss does not allow us to presuppose an unjustifiable risk that would lead to a finding of criminal negligence." *Id.* Instead, in *W.S.* we held that the father's conduct did not constitute a gross deviation from the standard of care a reasonable person in the father's circumstances would have exercised and that the child's injury was a "regrettable result of corporal punishment," rather than abuse. *Id.* (citing *P.R.*, 801 A.2d at 487; *J.B.*, 824 A.2d at 345.)

After the Law was amended in 2013, our Court clarified the analysis required under Section 6304(d) in *Allegheny County Office of Children, Youth & Families v. Department of Human Services*, 202 A.3d 155 (Pa. Cmwlth. 2018). In *Allegheny County*, a five-year-old child was picked up from school early due to misconduct and went to the home of her paternal grandmother. When her father came to the house, he smacked the child in the face, hit her on the thigh with his hand, and, while driving home, pinched her leg. After arriving home, the father started beating the child and smacked her on her bottom. The child said her injuries "hurt a lot." 202 A.3d at 157-58.

The Allegheny County Office of Children, Youth and Families (Allegheny CYF) received two reports alleging child abuse. Following an investigation,[13] Allegheny CYF filed two indicated reports of child abuse naming the father as the perpetrator. The father appealed. The ALJ found that the father's

---

[13] The caseworker assigned to investigate the allegations interviewed the child, the child's mother, maternal grandparents, and the father. The caseworker also took photographs showing scratches and red marks on the child's face and a long scratch on her thigh. The child's pediatrician conducted an acute examination and opined that the child's injuries, at the time she received them, caused her substantial pain. 202 A.3d at 158-59.

actions were excluded from the Law's definition of child abuse. The BHA affirmed, and Allegheny CYF appealed.

Before this Court, Allegheny CYF argued that the ALJ erred in finding that reasonable force was used, where the child suffered bodily injury and substantial pain. According to Allegheny CYF, the case was analogous to the facts in *F.R. v. Department of Public Welfare*, 4 A.3d 779 (Pa. Cmwlth. 2010), wherein we denied the parent's request for expungement. Allegheny CYF maintained that, like the father in *F.R.*, the father in *Allegheny County* lost control of his emotions and disregarded a substantial and unjustifiable risk when he struck his child in the face and pinched her leg.

The Department argued that "the mere fact that [the child] suffered substantial pain at the time of the corporal punishment does not mean [that the father] used unreasonable force." *Allegheny County*, 202 A.3d at 166. The Department relied on *W.S.*, in which we held that the father's conduct did not rise to the level of criminal negligence, although the child had suffered a serious injury. In *W.S.,* we cited evidence that "the father was a concerned parent who tried everything in his means to control his child and that, while he was upset at the time, he had demonstrated self-control by walking away from the situation after he made physical contact." *Allegheny County*, 202 A.3d at 166 (citing *W.S.*, 882 A.2d at 548).

Our analysis in *Allegheny County* recognized that the relevant standards were set forth by the Supreme Court in *P.R.* "A finding of abuse begins with the discovery that a child has suffered a serious injury. The investigation then goes in reverse in an effort to ascertain how and why that injury occurred. . . . [The standard of c]riminal negligence intertwines the concepts of foreseeability and intent to a degree that this court finds appropriate for differentiating cases of accidental and

21

non-accidental injury . . . ." *Allegheny County*, 202 A.3d at 166-67 (quoting *P.R.*, 801 A.2d at 486-87).

Further, in *Allegheny County* we noted that, after *F.R.* was decided, the legislature amended the Law to include Section 6304(d), codifying the right of parents to use reasonable force in the administration of corporal punishment. Reconciling the relevant legal principles, we held:

> [I]n cases where the child's injury arises from the administration of corporal punishment, the factfinder must make a determination as to whether the force used was "reasonable force," and in doing so, must consider whether the parent was criminally negligent in that he disregarded a substantial and unjustifiable risk or deviated from a standard of care that a reasonable person would observe in his situation.

*Allegheny County*, 202 A.3d at 167 (citations omitted). We noted that the determination of whether the father was criminally negligent was a legal conclusion and determined that the evidence did not establish criminal negligence. Accordingly, we affirmed the BHA's final order granting expungement.[14]

---

[14] In doing so, we added:

> We take note that traditional acts of corporal punishment might include a form of spanking, slapping, or pinching but, as the ALJ did in this case, the factfinder must look at the specific circumstances of the case and determine if the corporal punishment was done in a manner that was unreasonable and, further, consider whether the actions were criminally negligent.
>
> Moreover, we observe that both this Court and the Supreme Court have sustained appeals of parents who injured their children far more severely and who used items to punish their children that, it would seem, had the capacity to inflict far more damage than an open hand. See *P.R.*, 801 A.2d at 480 (use of a belt with a buckle to administer spanking that inadvertently hit the child's eye and

22

From these cases we distill the following principles. First, by statute, physical impairment or substantial pain caused by a parent's use of *reasonable force* for the purpose of disciplining his child is not child abuse. Consequently, where a child's injury results from the administration of corporal punishment, a determination of child abuse *begins* with the finding of a serious injury. Thereafter, the critical inquiry is whether *reasonable force* was used. That determination requires application of the criminal negligence standard, which requires proof that a substantial and unjustifiable risk of bodily injury was disregarded. In that analysis, neither the occurrence of physical impairment nor an experience of substantial pain is dispositive as to whether a parent used *unreasonable force*. The focus of the inquiry is *not* on the nature of the injury, but the conduct of the parent or guardian, considered under the totality of the circumstances. Additionally, when evaluating the evidence, the ALJ is not to make factual inferences that require medical expertise.

"In an expungement case, the county agency bears the burden of proving that the actions of the perpetrator constitute child abuse within the meaning of the Law." *W.S.*, 882 A.2d at 544. In this matter, after thorough review, we conclude that the ALJ's findings do not support a conclusion that the Department satisfied its burden of proof in the expungement proceeding. Although the ALJ did

---

required surgery); *W.S.*, 882 A.2d at [547-48] (slapping child's ear causing short-term hearing loss, bruising, swelling, redness); *Children and Youth Services for County of Berks [v. Department of Human Services* (Pa. Cmwlth., No. 1175 C.D. 2017, filed May 7, 2018) (hitting child with a wooden stick and breaking it on the child's leg causing a bruise).

*Allegheny County*, 202 A.3d at 168 n.13.

23

consider whether, under Section 6304(d), Father used reasonable force, the ALJ's analysis is not in accord with our previous rulings. The ALJ recognized Father's belief that corporal punishment was appropriate, that other methods of discipline had failed, that Father did not intend to cause Child undue pain, and that he attempted to moderate the spanking by hitting himself first.[15] However, the ALJ focused on the nature of Child's injury, and Father's subsequent regret, rather than Father's conduct at the time of the corporal punishment and the attendant circumstances, to support her legal conclusion.

### III. Conclusion

The ALJ's determinations that Father disregarded a substantial and unjustifiable risk and caused Child substantial pain are both inconsistent with case law and unsupported by the record. *P.R.*; *Allegheny County*; *W.S.* "Without substantial proof" that Child's pain "was more than the regrettable result of corporal punishment," we will not rely on such result "to presuppose the element of unjustifiable risk" that would support a finding of criminal negligence. *P.R.*, 801 A.2d at 487.

Accordingly, the BHA's order is reversed.

 

 

_____
MICHAEL H. WOJCIK, Judge

---

[15] F.F. Nos. 10, 11, 43. *Compare F.R.,* 4 A.3d at 788. In that case, we affirmed an ALJ's determination that the father disregarded a substantial and unjustifiable risk when applying corporal punishment, causing the child to experience functional impairment and severe pain. The ALJ explained that while the father did not act with malicious intent, the father lost control of his emotions while disciplining his child.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J. S.,                                    :
                        Petitioner        :
                                          :  **CASE SEALED**
              v.                          :
                                          :  No. 1772 C.D. 2017
Department of Human Services,             :
                                          :
                        Respondent        :


O R D E R


AND NOW, this 15th day of November, 2019, the November 3, 2017 order of the Department of Human Services, Bureau of Hearings and Appeals, is REVERSED.


_____
MICHAEL H. WOJCIK, Judge