E.D., Petitioner,

v.

## DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 7, 1998.
Decided Oct. 14, 1998.

Julie A. Auerbach, Media, for petitioner.

James S. Marshall, Philadelphia, for respondent.

Before COLINS, President Judge, LEADBETTER, J.(P.) and MIRARCHI, Jr., Senior Judge.

MIRARCHI, Jr., Senior Judge.

E.D. petitions this Court to review an order of the Pennsylvania Department of Public Welfare (the Department) adopting a recommendation of a hearing officer that E.D.'s appeal from a decision of the Department's Office of Children, Youth and Families (OCYF) be denied. OCYF had filed an indicated report of child abuse against E.D. We reverse.

The hearing officer made extensive findings of fact that we summarize as follows. E.D. and his wife have been foster parents with Children and Youth Services from 1979 to 1984 and have been foster parents with Children's Choice for four and one-half years prior to the alleged incident of child abuse.[1] On October 13, 1995, E.D. and his wife were attending a women, children, and infants (WIC) program. L.W., an employee of WIC, observed E.D. in a confrontation with a male child at approximately 9:20 a.m. that morning. The child was three to five years of age and wearing a protective helmet on his head the same as or similar to the kind used for bicycle riding and other sports. The helmet was strapped to the child's head. The child was kneeling and leaning back on his heels. E.D. was asking the child to come and at one point stated: "We can do this your way or we

---

1. Testimony delivered at the hearing indicated that E.D. and his wife had been foster parents for approximately thirteen children during these periods.

can do this my way." The child, however, remained on his knees. L.W. then observed E.D. place his hand on the child's helmet and lift him up by it. The child began crying, his face was turning red, and he was coughing. The child helped himself up as E.D. lifted him by the helmet. The child was crying and told E.D. that he hated him. The incident was over within approximately "five seconds" and L.W. returned to her duties.

Approximately forty minutes after that incident, D.S.C., an employee of a business located in the building occupied by WIC, observed a child being pursued by E.D. in the vestibule of the building. The child was approximately five years old and wearing a protective helmet fastened to the child's head by a chinstrap. The child was giggling and E.D. was telling him to come back. The child dropped to his knees and E.D. grabbed him by the helmet, his fingers inside the air holes. E.D. then lifted the child, suspending him, the child's toes hitting the carpet and his legs bent. The child's weight was supported by the chinstrap. The child's face was red, and D.S.C. heard gurgling noises. D.S.C then yelled out: "What the hell are you doing?" E.D. dropped the child and said, "I don't always do this." The child fell back on his knees. The child was suspended for approximately two to three seconds. E.D. then said to the child, "Come on, let's go." The boy got up and followed E.D. back into the WIC office. D.S.C. then contacted the WIC office and reported what he had seen.

An allegation of child abuse was filed against E.D., and the case was investigated by John Bevivino of OCYF. It was alleged that E.D. lifted a child, J.S., by his helmet and suspended him in the air with the child's weight supported only by the chinstrap of the helmet. J.S., who was born in January 1991, was in the foster care of E.D. and his wife at the time.

Bevivino interviewed E.D. and his wife and the witnesses to the incident on October 13, 1995, L.W. and D.S.C. Bevivino also interviewed personnel from the Philadelphia Department of Human Services and the foster care agency. Bevivino further spoke with a physician. Bevivino also met with J.S., who wore a protective helmet at the meeting. A social worker was present at that meeting. Because of the child's constant activity, however, Bevivino was unable to conduct an interview. The social worker explained to Bevivino that J.S. wore a protective helmet to protect himself because he is a hyperactive child. Bevivino did observe a purplish bruise under the child's chin, reaching almost from ear to ear.

After conducting his investigation, Bevivino concluded that J.S. would have been seriously hurt had not D.S.C. intervened during the incident where E.D. lifted and suspended J.S. by the helmet. An indicated report of child abuse was thereupon filed.

J.S. is a difficult child who would throw food around the kitchen, throw toys around, and not properly eat. He has been in the hospital numerous times because of seizure activity. He requires medication to control his activity, but his natural father refuses to consent to the medication.[2] At the time of the incident, E.D. and his wife were caring for two other foster children in addition to J.S. All of the children have been removed from the household, and Children's Choice had reached an agreement with E.D. and his wife that E.D. will no longer be responsible for the care of a child. There is no dispute that prior to the incident, E.D. and his wife had a clear record as foster parents for the approximately ten years that they served in that capacity. E.D. had told Bevivino that he did not intend to lift J.S. by the helmet, but was pursuing him and made a grab for the child's shirt to prevent him from running to the street.

E.D.'s wife testified at the hearing that they had never had a child as uncontrollable as J.S. and that they asked Children's Choice to remove J.S. because they could not control him and because he was affecting their ability to care for the other two foster children in their care. These children also had special needs. One was severely learning disabled and the other was a chemical burn baby.

---

**2.** At argument before this Court, the Department had no answer regarding what steps, if any, had been taken to see that J.S. received the medication he needed.

E.D.'s wife testified to the uncontrollable behavior exhibited by J.S. and his picking fights with one foster child and his throwing toys at the other, who was a baby.

E.D. requested the Department to expunge the indicated report of child abuse. The Department refused, and E.D. filed a timely appeal. A hearing was held before a hearing officer. Testifying were L.W., D.S.C., Bevivino, E.D.'s wife, and another foster parent who was acquainted with E.D. and his wife. The hearing officer concluded that the Department's decision should be affirmed because E.D. placed J.S. at imminent risk of serious physical injury when he suspended the child by the helmet, which injury was averted by the intervention of D.S.C. The Department adopted the hearing officer's recommendation, and this petition for review followed.

■ This Court's scope of review in expunction proceedings is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Bucks County Children & Youth Social Services Agency v. Department of Public Welfare,* 151 Pa.Cmwlth. 110, 616 A.2d 170 (1992). Substantial evidence, for purposes of child abuse expunction proceedings, "is defined as evidence which 'so preponderates in favor of a conclusion that it outweighs, in the mind of the factfinder, any inconsistent evidence and reasonable inferences drawn therefrom.'" *Bedford County Children & Youth Services v. Department of Public Welfare,* 149 Pa.Cmwlth. 127, 613 A.2d 48, 50 (1992) (quoting *Children & Youth Services Division, Department of Human Services, County of Northampton v. Department of Public Welfare,* 103 Pa.Cmwlth. 616, 520 A.2d 1246, 1249 (1987)).

E.D. argues that the Department erred as a matter of law by refusing to expunge the indicated report of child abuse. E.D. further argues that the decision denying his request to expunge the indicated report of child abuse was not supported by substantial evidence. In short, E.D. contends that his actions on October 13, 1995 do not meet the legal definition of child abuse in that he did not, at that time, place J.S. at imminent risk of serious physical injury.

Effective July 1, 1995, the Child Protective Services Law, 23 Pa.C.S. §§ 6301–6385 was amended to expand the definition of child -abuse. As a result, child abuse is now (and for purposes of this case) defined as:

(i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.

(ii) An act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

(iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide the essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.

23 Pa.C.S. § 6303(b)(1). Serious physical injury is defined as an injury that "(1) causes a child severe pain; or (2) significantly impairs a child's functioning, either temporarily or permanently." 23 Pa.C.S. § 6303(a).

The Department, in proposed regulations published in its OCYF Bulletin, has provided guidelines for its interpretation of "imminent risk." These proposed regulations provide, in part, that to substantiate a case of imminent risk of serious physical injury:

(a) a specific act or failure to act must be documented;

(b) the act or failure to act must result in risk of abuse; i.e., be supported by substantial evidence that serious physical injury ... *would have* occurred;

(c) the risk of abuse must have been imminent;

(1) For risk of serious physical injury, 'imminent' means during and/or immediately following the act or failure to act....

(d) [f]or an alleged *act* of imminent risk of serious physical injury:

(1) there must be substantial evidence that, but for happenstance, the intervention of a third party or actions by the alleged victim, serious injury would have occurred; and

(2) the injury would have been serious; i.e., *would have:*

(i) caused the child severe pain; or

(ii) significantly impaired the child's physical functioning.

OCYF Bulletin, 3490–95–02, pp. 3–4, 2(b)(II) (emphasis in original).

The Department also provided the following guidance in its proposed regulations:

(IV) To assess the existence of imminent risk of serious physical injury ... the following considerations apply: ·

(A) Are the conclusions drawn from an alleged incident based on the factual circumstances of the case and substantial evidence as indicated by:

(1) interviews with the persons involved in the incident;

(2) witnesses to the incident;

(3) physical evidence left as a result of an incident;

(4) expert assessment, where appropriate;

(5) a history of violence;

(6) a history of bad judgment;

(7) prior incidents;

(8) involvement of law enforcement; and

(9) supervisory and, if possible, multidisciplinary team concurrence.

(B) Do the social and familial circumstances surrounding the incident support the conclusion that the alleged perpetrator attempted the abuse or allowed risk of abuse to occur; e.g., ongoing parent child conflict, substance abuse, child custody issues, etc.?

(C) Has the investigation produced documented evidence to substantiate the items in (d)(1) above; e.g., photographs, evalua-

tions, statements, reports of prior incidents, etc.?

*Id.,* p. 5, 2(b)(IV).

The report of indicated child abuse against E.D. was filed under 23 Pa.C.S. § 6303(b)(1)(iii) because of the determination that E.D. placed J.S. at imminent risk of serious physical injury by suspending J.S. from his helmet, which serious physical injury was averted by the intervention of D.S.C. who yelled out to E.D. The report was based on this one act alone. At the hearing, the act was testified to by a direct witness, D.S.C. Further, Mr. Bevivino testified with regard to his investigation and his observance of the bruise underneath the chin of J.S. Also, L.W. testified regarding her observation of the first incident on October 13, 1995 where E.D. picked J.S. off the floor by the helmet. No physician or other expert testified with regard to whether E.D.'s actions, as witnessed by D.S.C., would have resulted in serious physical injury to the child, *i.e.,* resulting in severe pain to the child or a significant impairment of the child's physical functioning, had not D.S.C. intervened. The position of the Department in this appeal is that it is self-evident that E.D.'s picking up of J.S. by the helmet and suspending him would have caused serious physical injury to J.S. had not D.S.C. intervened and caused E.D. to release the child. The Department further argues that any consideration of E.D.'s record with children is irrelevant in light of the magnitude of E.D.'s act of lifting J.S. and suspending him by his helmet.

 We cannot agree with the Department's position. The burden of establishing by substantial evidence that an indicated report of child abuse is accurate rests upon the appropriate county children and youth agency. 23 Pa.C.S. § 6341(c). In this case, that burden was to prove that E.D.'s act placed J.S. in imminent risk of suffering serious physical injury, *i.e.,* severe pain or a significant impairment of his functioning. In accordance with the Department's proposed regulations, the agency's burden is more particularly described as establishing that but for a beneficial intervention the child *would*

*have* suffered severe pain or a significant impairment of his or her functioning.[3]

■ Here, no evidence was presented that J.S. *would have* suffered severe pain or a significant impairment of his functioning had D.S.C. not cried out. For example, no medical evidence was introduced to establish that but for D.S.C.'s prompt intervention J.S. would have suffered serious physical injury. Nor was any evidence introduced that would make it likely that E.D. would have left J.S. suspended until such time as he suffered serious physical injury rather than putting him down quickly once he was off the floor. In this regard, we must disagree with the Department that evidence regarding E.D.'s past record with violence, bad judgment, or prior incidents is not necessary. Indeed, the Department's own proposed regulations indicate that these and other matters should be considered to assess the existence of an imminent risk of serious physical injury. No evidence was introduced that would indicate that E.D.'s past behavior or circumstances would have supported a finding that E.D. would have constrained J.S. until he suffered serious physical injury. Indeed, there is no dispute below that E.D.'s record as a foster parent was without blemish until October 13, 1995. Further, no evidence was introduced to show that E.D. desired to inflict severe pain upon J.S. as punishment or a form of control.

■ Make no mistake: we do not condone E.D.'s acts of lifting a child up from the floor by the head and the helmet attached to it. Such acts *could have* inflicted serious physical injury upon J.S. For the risk to be imminent under the Child Protective Services Law, however, the evidence must show that the acts *would have* inflicted serious physical injury. This is in accordance with the Department's own proposed regulations and the common definition of "imminent" found in dictionaries.[4] Thus, under the record developed below, we reject the Department's position that E.D.'s act as witnessed by D.S.C. self-evidently would have caused J.S. serious physical injury had not D.S.C. yelled out. Accordingly, OCYF did not sustain its burden of proving the accuracy of the indicated report of child abuse under Section 6303(b)(1)(iii) of the Child Protective Services Law, 23 Pa.C.S. § 6303(b)(1)(iii).

We therefore reverse the Department's order and remand this matter to the Department with instructions that the indicated report of child abuse filed against E.D., arising from the incident occurring October 13, 1995, be expunged.

### ORDER

AND NOW, this 14th day of October, 1998, the order of the Pennsylvania Department of Public Welfare (Department) in the above-captioned matter is hereby reversed; and this matter is remanded to the Department with instructions that the indicated report of child abuse filed against E.D., as further defined in the accompanying opinion, shall be expunged.

Jurisdiction relinquished.

---

**3.** A *proposed* regulation does not have the force of law, as does one duly promulgated. As such, it remains a statement of policy of the agency that has persuasive, but not binding, power if it tracks the meaning of the related statute. *Department of Health v. North Hills, Passavant Hospital*, 674 A.2d 1141 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 546 Pa. 685, 686 A.2d 1314 (1996). We believe the proposed regulations quoted in this opinion do sufficiently track the meaning of the related amendments to the Child Protective Services Law and are persuasive in our interpretation of "imminent risk." The OCYF Bulletin publishing the proposed regu-

lations indicates that they are to be treated as guidelines until publication as final rulemaking in the *Pennsylvania Bulletin*. OCYF Bulletin, 3490–95–02, p. 1.

**4.** Webster's New Collegiate Dictionary 568 (1981) defines "imminent" as "ready to take place; *esp:* hanging threateningly over one's head." Black's Law Dictionary 676 (5th ed.1984) defines "imminent" as "Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous."