**A. B., Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Dec. 17, 2004.
Decided March 9, 2005.

John E. Perrott, Uniontown, for petitioner.

Anthony S. Dedola, Jr., Uniontown, for respondent.

BEFORE: COLINS, President Judge, and SMITH–RIBNER, Judge, and JIULIANTE, Senior Judge.

OPINION BY President Judge COLINS.

A.B. (Appellant) petitions for review of an adjudication of the Department of Public Welfare (DPW) denying her request to expunge a report of indicated child abuse filed by a caseworker for Fayette County Children and Youth Services (CYS) pursuant to the Child Protective Services Law (Law).[1]

---

1. 23 Pa.C.S. §§ 6301–6385. Section 6341(a)(2) of the Law states, in pertinent part:

Any person named as a perpetrator ... in an indicated report of child abuse may, within 45 days of being notified of the sta-

A.B. is the natural mother of J.B., a male child born prematurely on September 10, 2001, and weighing 4 pounds, 8 and ½ ounces at birth. After his birth, J.B. remained hospitalized for several weeks before being discharged into A.B.'s care. Although A.B. initially attempted to breast feed J.B., she was unsuccessful in doing so, and bottle fed J.B. while the latter was in her care from September 2001 through December 10, 2001. The record indicates that J.B. was a difficult infant to feed and that A.B. failed to properly feed J.B. during the aforementioned time period, resulting in J.B.'s failure to appropriately gain weight. A.B. admitted that J.B. was improperly fed while in her care prior to December 10, 2001.

On December 10, 2001, J.B. was admitted to the hospital following an office visit to his pediatrician, Bchara Janadari, M.D. On five separate visits prior to and including December 10, 2001, Dr. Janadari ex-

amined J.B., weighed him, and recorded the changes in J.B.'s weight as follows:

| Date | Weight | Change +/- |
|------|--------|-----------|
| October 12, 2001 | 5 lbs., 6 oz. | N/A |
| November 16, 2001 | 5 lbs., 6 oz. | none |
| November 19, 2001 | 5 lbs., 12 oz. | +6 oz. |
| November 27, 2001 | 5 lbs., 11 oz. | -1 oz. |
| December 10, 2001 | 5 lbs., 4 oz. | -7 oz. |

■ According to the record, there was no medical explanation for J.B.'s failure to gain weight while in A.B.'s care, and after December 12, 2001, CYS assumed custody of J.B. After being removed from A.B.'s care, J.B. was hospitalized and diagnosed with mild anemia, but he gained weight. On December 19, 2001, J.B. weighed 6 lbs., 10 ounces. Thereafter, while in foster care, J.B. gained weight appropriately and did not lose weight from one medical appointment to the next. On January 24, 2002, CYS filed an indicated report[2] of child abuse[3] against A.B. with the Child-Line Registry. Subsequently, DPW denied A.B.'s request to expunge her name

tus of the report, request the secretary to amend or expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with this chapter. 23 Pa.C.S. § 6341(a)(2).

**2.** The Law defines an "indicated report" as follows:

A child abuse report made pursuant to this chapter if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on any of the following:

(1) Available medical evidence.

(2) The child protective service investigation.

(3) An admission of the acts of abuse by the perpetrator.

23 Pa.C.S. § 6303(a).

The county agency bears the burden of proving in an expungement case that the actions of the perpetrator constitute child abuse within the meaning of the statute. The county's evidence must outweigh any contrary evidence. *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271, 1275 (Pa. Cmwlth.2001).

**3.** *23 Pa.C.S. § 6303(b)(1)* defines child abuse as follows:

(b) Child abuse.—

(1) The term "child abuse" shall mean any of the following:

(i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.

(ii) An act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

. . . .

(iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.

"Serious physical injury" is defined as "[a]n injury that: (1) causes a child severe pain; or (2) significantly impairs a child's physical functioning, either temporarily or permanently." 23 Pa.C.S. § 6303(a).

from the ChildLine Registry, from which decision A.B. appealed on February 19, 2002.

A hearing was conducted on January 16, 2003, during which A.B.'s counsel argued that DPW failed to offer sufficient evidence to support the conclusion that A.B. failed to properly feed the subject child, therefore endangering said child's life or impairing the child's functioning.

Further, A.B.'s counsel contended that even if his client's errors of commission or omission rose to a failure to provide J.B. with the "essentials of life," such behavior was the result of a major depressive disorder from which A.B. was suffering during this time period.

■ After reviewing the hearing testimony, briefs, and exhibits submitted by the respective parties, the administrative law judge (ALJ) concluded that DPW had established that A.B.'s name should properly be kept in the ChildLine Registry as a perpetrator of child abuse (serious physical neglect) and recommended that A.B.'s appeal be denied. On June 9, 2004, the Bureau of Hearings and Appeals adopted the ALJ's recommendation in its entirety. This appeal followed.[4]

■ On appeal, A.B. argues that the ALJ erred in concluding that A.B.'s mental state was "irrelevant" during the time period in which she failed to provide life essentials to J.B. It is A.B.'s contention that the plain language of 23 Pa.C.S. § 6303(b)(1)(iv) regarding serious physical neglect requires a statutory construction encompassing knowledge, intent, or capacity on the part of the perpetrator, all of which A.B. did not and could not have had because she was suffering from major depression. Therefore, A.B. avers that she cannot be held accountable for serious physical neglect within the meaning of Section 6303(b)(1)(iv). Additionally, A.B. maintains that the ALJ erred in concluding that her failure to adequately feed J.B. endangered J.B.'s life and development because DPW failed to proffer any medical or other evidence in support of this conclusion.

Upon review of the record, this Court notes that even if A.B. suffered from post-partum depression from the time of J.B.'s birth on September 10, 2001 to December 10, 2001, such post-partum depression in and of itself is insufficient to establish serious physical neglect based upon a child's alleged "failure to thrive" so as to constitute child abuse within the meaning of the Law and DPW regulations. In *Commonwealth v. Tharp*, 574 Pa. 202 n. 12, 830 A.2d 519, 526 n. 12 (2003), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004), this Court stated:

> Failure to thrive is a serious medical condition in which a child's height, weight, and motor development fall significantly short of the average growth rates of normal children. About 10% of failure to thrive cases have an organic cause; the rest result from disturbed parent-child relationships manifested in severe physical and emotional neglect of the child. In the Interest of Patricia S., 326 Pa.Super. 434, 474 A.2d 318, 319

---

4. This Court's scope of review in expunction proceedings is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704; *E.D. v. Department of Public Welfare*, 719 A.2d 384, 387 (Pa.Cmwlth.1998). Substantial evidence, for purposes of child abuse expunction proceedings, is defined as "evidence which so preponderates in favor of a conclusion that it outweighs, in the mind of the factfinder, any inconsistent evidence and reasonable inferences drawn therefrom." *Id.*, 719 A.2d at 387 (citations omitted).

(1984) (citing Interdisciplinary Glossary On Child Abuse and Neglect, LEGAL, MEDICAL, SOCIAL WORK TERMS, DHEW Pub. No. (OHDS) 78–30137, reprinted in CHILD ABUSE AND NEGLECT LITIGATION, DHHS Pub. No. (OHDS) 80–30268 (March 1981)).

Applying the foregoing to the present matter, the weight records kept by Dr. Janadari for J.B.'s five visits indicate that between the first and fifth visit, J.B.'s actual weight loss was only 2 ounces. This cannot be deemed a significant loss, considering that J.B. was born prematurely, weighed only 4 pounds, 8 and ½ ounces at birth, and remained hospitalized for several weeks before being released into A.B.'s custody. During the hearing, Dr. Janadari conceded that many premature babies are "slow feeders" and may be more difficult to feed than non premature babies. He also repeatedly indicated that, except for mild anemia, there were no other medical problems exhibited by J.B. other than being underweight.

Because J.B. was not responding to A.B.'s feeding methods in terms of gaining weight, Dr. Janadari cautiously placed J.B. in the hospital for several days, where J.B. was fed the same formula in approximately the same amount as A.B. stated she had fed the child. Subsequently, A.B. received outside agency assistance in learning how to properly feed J.B. During the follow-up period after being released from the hospital, J.B., according to the record, seems to be eating and maintaining his weight without significant problems. In this regard, the following testimony elicited from A.B. during the January 16, 2003 hearing is relevant:

[Direct Examination of A.B.]

Q. During that period of time [September to December 10, 2001], did you have a bonding problem with J., that you can remember?

A. I felt that ... he [J.B.] didn't like me. What was wrong with me? That's what I felt ... he was more difficult to feed because he cried a lot. My other son did not ... I felt like okay, ... Don't you like me? I'm trying to do everything for you.

Q. ... [Y]ou kept your doctor's appointments with Dr. Janadari appropriately?

A. Yes....

Q. Okay. That was the appointment on December 10th?

A. Right.

Q. When he [Dr. Janadari] had to place the baby in the hospital?

A. Right.... He asked me what was going on with him [J.B.]. And I said at that time I tried to do everything by myself. That's what I was doing and that's what I tried to explain to him ... That's what I told him, I said, the baby's crying ... At the time, I had no help.

Q. Did you realize that J. wasn't getting enough to eat?

A. That's when I realized.... He said we got to do something. You need some help.... So then they took him [J.B.] to the hospital.

(Hearing Notes of Testimony, 1/16/03/ pp. 97–100.)

In consideration of the foregoing, we conclude that during the defined time period from September 2001 through December 10, 2001, although J.B. was deemed underweight by Dr. Janadari, his two ounce weight loss without other medical problems was not sufficiently significant to be characterized as "failing to thrive" while in A.B.'s custody as a result of being deprived of the "essentials of life." Further, in the matter *sub judice*, considering J.B.'s premature birth, small birth weight, and problematic eating pattern from the

outset, we find that DPW failed to establish that A.B.'s feeding of J.B., even given the difficulties she indicated when testifying at the hearing such as J.B.'s spitting up while being fed, rose to the level of serious physical neglect based upon a "failure to thrive," that would warrant her being classified as a perpetrator of child abuse within the meaning of the Law.

Accordingly, we reverse DPW's adjudication.

## *ORDER*

AND NOW, this 9th day of March 2005, the order of the Department of Public Welfare in the above-captioned matter is hereby REVERSED.