J-A26004-22
J-A26005-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: C.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1713 EDA 2022 |

Appeal from the Order Entered June 10, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000802-2021

| IN THE INTEREST OF: C.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1714 EDA 2022 |

Appeal from the Order Entered June 10, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000802-2021

BEFORE:   BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                          **FILED JANUARY 17, 2023**

R.W. ("Father") and M.W. ("Mother") (collectively, "Parents") appeal

from the June 10, 2022 finding that they perpetrated child abuse against their

daughter, C.W., pursuant to the Child Protective Services Law ("CPSL").  While

_____

[*] Retired Senior Judge assigned to the Superior Court.

Parents' appeals are listed consecutively as separate actions, we dispose of both appeals in a single writing because they involve overlapping facts and shared legal arguments. We affirm.

C.W. was born in January of 2021. Six months later, C.W.'s pediatrician, Sarah Taub, M.D., diagnosed the child with "failure to thrive" and directed Parents to take the child to Bryn Mawr Hospital. N.T., 9/24/21, at 14-15. Upon admission into the pediatric unit, C.W. weighed "almost nine pounds." *Id*. at 15. C.W. was treated in the hospital by Margarita Sergonis, M.D., a pediatric physician, who diagnosed C.W. as suffering from "severe malnutrition." *Id*. at 11, 16. In addition, Dr. Sergonis found C.W. "developmentally delayed in that she was not able to roll over at the time, and was unable to sit without support, and really didn't do well with pushing herself up on her chest. She seemed weak. . . . She had some muscle wasting. . . . [S]he had very thin extremities." *Id*. at 26. Dr. Sergonis testified that "the trajectory of [C.W.'s] brain growth was also starting to slow." *Id*. at 17.

Dr. Sergonis ordered a variety of testing for C.W. while in the hospital, none of which explained her severe malnutrition. *Id*. at 18-19. According to Dr. Sergonis, C.W. was fed formula every three to four hours while in the hospital, and she observed that C.W. "was very hungry, and she wanted more[;] she was an eager feeder." *Id*. at 21. Dr. Sergonis ordered that C.W. be given six ounces of formula per feeding in the hospital. *Id*. By the time of her discharge on August 5, 2021, C.W. had gained a total of 400 grams, or

80 grams of weight each day in the hospital. *Id*. at 27, 30. As such, Dr. Sergonis opined to a reasonable degree of medical certainty, that C.W.'s severe malnutrition "was due to inadequate caloric intake." *Id*. at 31.

Following a general protective services report, which the Philadelphia Department of Human Services ("DHS") ultimately validated, C.W. was discharged from the hospital into the protective custody of DHS. N.T., 2/16/22, at 12, 14. The juvenile court issued a shelter care order the following day. On August 10, 2021, DHS filed a dependency petition, which it amended on November 2, 2021, pursuant to the Juvenile Act, 42 Pa.C.S. § 6302, and requested a finding of child abuse pursuant to the portion of the CPSL concerning "[c]ausing serious physical neglect of a child." 23 Pa.C.S. § 6303(b.1)(7).

The juvenile hearing commenced on September 24, 2021, and continued November 4, 2021, and February 16, 2022. During all the hearings, C.W. was represented by a guardian *ad litem* ("GAL"). Parents consented to C.W.'s adjudication of dependency but disputed the disposition and the child abuse allegations. DHS presented, *inter alia*, the testimony of Drs. Sergonis and Taub, Jacqueline Staggers-Fields, who investigated the Child Protective Services ("CPS") report for DHS, and Laura Crooks, a Montgomery County caseworker who was previously assigned to the family in relation to the protective custody of Parents' two older sons due to diagnoses of failure to

thrive when the children were twenty months old and five months old, respectively.[1]

At the conclusion of the evidentiary hearing, the juvenile court adjudicated C.W. dependent and maintained her foster care placement. The agency designated the CPS report as "indicated[2]" based on Dr. Sergonis's testimony during the initial adjudicatory hearing on September 24, 2021, but the juvenile court deferred its child abuse ruling until after oral argument on June 10, 2022. Significantly, during the ensuing argument, the GAL proffered that C.W. "was a victim of child abuse, perpetrated knowingly and recklessly by [M]other and [F]ather by their failure to provide [C.W.] with the adequate nutrition and calories she needed for her growth and development." N.T., 6/10/22, at 16. At the conclusion of argument, the juvenile court found that C.W. was a victim of child abuse perpetrated by Mother and Father pursuant to 23 Pa.C.S. § 6303(b.1). Accordingly, the court updated the designation of the CPS report from "indicated" to "founded," *i.e.*, it made a judicial

---

[1] The two older siblings are not part of this appeal. They were previously adjudicated dependent, but the Montgomery County agency closed the family's case in 2021, due to Parents moving out of the county as well as meeting their permanency goals. On February 16, 2022, Parents stipulated that these children would remain in the family home subject to DHS supervision. N.T., 2/16/22, at 10.

[2] A CPS report is "indicated" where "an investigation by the department or county agency determines that substantial evidence of the alleged abuse by a perpetrator exists based on . . . (i) [a]vailable medical evidence[;] (ii) [t]he child protective service investigation[; or] (iii) [a]n admission of the acts of abuse by the perpetrator." 23 Pa.C.S. § 6303(a)(1).

adjudication of abuse.  *See* 23 Pa.C.S. § 6303(a)(1).  Mother and Father timely filed notices of appeal and concise statements of errors complained of on appeal.  The juvenile court complied with Rule 1925(a) by identifying the portions of the certified record that state the court's reasons for the order.

Mother presents the following issue on appeal:

1. Did the trial court err as a matter of law and abuse its discretion by finding Mother to be a perpetrator of child abuse pursuant to 23 Pa.C.S. § 6303 in the absence of clear and convincing evidence that Mother acted with at least reckless intent?

Mother's brief at 3.

Father presents the following issue on appeal:

1. Did the trial court err and/or abuse its discretion by making a finding of child abuse under the Child Protective Services Law, 23 Pa.C.S. §§ 6301-6385[,] that was not supported by the record and testimony proffered[?]

Father's brief at 8.

Our standard of review "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion." *In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa.Super. 2021) (citation omitted).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *Id*. (citation omitted).

This Court has explained:

Although dependency proceedings are governed by the Juvenile Act (Act), the CPSL controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. *In re L.V.*, 209 A.3d 399, 417 (Pa.Super. 2019); *see also In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa.Super. 2021) (same). The CPSL "does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child." *In the Interest of J.R.W.*, 631 A.2d 1019, 1022 (Pa.Super. 1993). The Act and the CPSL must be applied together in the resolution of child abuse complaints under the CPSL and reference must be made to the definition sections of both the Law and the CPSL to determine how that finding of child abuse is interrelated. *Id.* at 1023.

As part of a dependency adjudication, a court may find a parent or caregiver to be the perpetrator of child abuse as defined by the CPSL. *In re S.L.*, 202 A.3d 723, 728 (Pa.Super. 2019). Section 6381 of the CPSL, which governs evidence in court proceedings, states that "in addition to the rules of evidence . . . relating to juvenile matters, the rules of evidence in this section **shall govern** in child abuse proceedings in court." 23 Pa.C.S. § 6381(a) (emphasis added). . . .

In *In the Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), the Pennsylvania Supreme Court recently reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to section 6303(b.1) of the CPSL is clear and convincing evidence. A petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." . . .

*Id*. at 668 (citations omitted).

***In the Interest of C.B.***, 264 A.3d 761, 770 (Pa.Super. 2021) (*en banc*) (cleaned up) (footnotes omitted).

Instantly, DHS alleged child abuse against Parents pursuant to § 6303(b.1)(7) of the CPSL, which provides "The term 'child abuse' shall mean intentionally, knowingly or recklessly . . . [c]ausing serious physical neglect of a child."  23 Pa.C.S. § 6303(b.1)(7).  In this vein, "Serious physical neglect" is defined as

> Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
>
> (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
>
> (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

23 Pa.C.S. § 6303(a) ("Serious physical neglect").

At the outset, we address, collectively, Parents' challenge to the juvenile court's finding that they acted at least recklessly.  For purposes of the CPSL, the term "recklessly" has the same meaning as set forth in  18 Pa.C.S. § 302, which provides,

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(1)-(3).

Mother argues that DHS failed to prove clearly and convincingly that she acted with at least reckless intent in causing C.W. serious physical neglect by failing to provide her with sufficient calories to sustain her life and development. Mother's brief at 15. Mother asserts the evidence demonstrates that she (1) was aware of the substantial risk to C.W.'s health by not gaining weight; (2) attempted to provide the child with adequate calories, but did not know how much formula she should have been feeding C.W., and was unaware how much food the child "was *actually* receiving" due to the nature of breast-feeding; and (3) never missed an appointment with Dr. Taub, the pediatrician. *Id*. at 17-18, 20, 22, 27. Mother argues, "Given the information known to [her], she did not deviate from the conduct of a reasonable person in her situation." *Id*. at 20.

Likewise, Father argues that DHS failed to prove that he acted with reckless intent in causing C.W. serious physical neglect. Specifically, Father argues that he did not consciously disregard a substantial risk of injury to C.W. but "diligently attempted to avoid the risk considering the information he had." Father's brief at 19. Father asserts there is no testimony demonstrating that he "knew exactly how much formula or breast milk C.W. needed and that he was disregarding any recommendation and putting C.W.'s health at risk." *Id*. at 22. Further, Father asserts that when Dr. Taub recommended that formula be fed to the child, "she was not clear at all on how many ounces Mother or

Father should feed." *Id*. Like Mother, Father emphasizes that he and Mother

attended every medical appointment for C.W. and followed all

recommendations. *Id*. at 21. Moreover, he claims:

> While hospitalized, C.W.'s formula had to be changed and then at
> that time, she did begin to gain weight. N.T., 9/24/21, at 43.
> However, even upon discharge from the hospital, C.W. remained
> under the one percentile on the growth/weight chart and C.W. was
> referred to genetics to follow up with her. N.T., 11/4/21, at 55-
> 56.

*Id*. at 21-22.

Both DHS and the GAL filed separate responsive briefs in Parents'

appeals. DHS responded that Parents "perpetrated serious physical neglect

against C.W. by knowingly and recklessly failing to provide C.W. with sufficient

calories, which threatened her well-being and impaired her health,

development or functioning." DHS briefs at 20. The GAL, in support of the

order, responded by asserting that Parents "disregarded the instructions of

C.W.'s doctor to feed C.W. an adequate amount of formula to promote her

growth and development and left C.W. in a state of failure to thrive." GAL

briefs at 29. We agree.

> The trial court offered the following rationale from the bench:

> [M]other and [F]ather were reporting . . . to Dr. Taub [C.W.'s
> pediatrician] . . . that they were feeding [C.W.] 30 ounces [of
> formula per day], based on the number of bottles they described
> she was getting per day and the number of ounces in those
> bottles.

> And so, what that says to me is that [M]other and [F]ather clearly
> knew from the doctor the minimum number of ounces that she

was looking for [C.W.] to have, and they were reporting that she was receiving those number of ounces.

Juxtapose that against the testimony from Dr. Sergonis, that when [C.W.] was admitted to the hospital, those are the exact same numbers of ounces that they fed her in the hospital, and she gained weight.

And, in fact, Dr. Taub testified that when the foster parent came in for the follow-up visit, after [C.W.] had been released from the hospital, the foster parent also reported giving her 30 ounces, and [C.W.] was still gaining weight.

So, [C.W.] gained two pounds in the hospital, after only five days, receiving the same number of ounces of food that [M]other and [F]ather at home. And let me add, [M]other and [F]ather were reporting to Dr. Taub that, in addition to the 30 ounces, [C.W.] was getting some solid foods.

None of that is consistent with what was shown and proven when she was in the hospital. And so, it is for that reason I am going to find that . . . DHS proved, by clear and convincing evidence, they knew exactly how many ounces [C.W.] was supposed to be given, and, in fact, her hospital stay over five days shows that, when given those ounces, she would have been gaining weight.

And so, I'm going to find [M]other and [F]ather as perpetrators of child abuse, based on [C.W.]'s failure to thrive. They knowingly, or recklessly — however you want to put it — I'm going to put it under knowingly — did not give her the amount of food she was supposed to get, because had they given her the amount she was supposed to get, the evidence shows she would have gained weight, because, in fact, she did gain weight in the hospital, given the same amount of food.

N.T., 6/10/22, at 39-41.

As outlined, *infra*, the certified record supports the juvenile court's findings. Mother brought C.W. to her first appointment with Dr. Taub on February 26, 2021, when she was one month old. N.T., 11/4/21, at 15, 18. The child then weighed 7 pounds, 1.9 ounces, which was "slightly more" than

- 10 -

her birth weight of 6 pounds, 8.6 ounces. *Id*. at 17. Dr. Taub testified that Mother reported breast-feeding eight or nine times in a twenty-four-hour period, and she reported no problems with feeding or any other matters related to a one-month-old child. *Id*. at 18. Dr. Taub testified that her office note reflected that C.W. "was gaining weight slowly," but, based on Mother's report that she was nursing well and "had a good routine at home, making sure to wake the baby to feed," Dr. Taub had no specific concern regarding C.W. at that time. *Id*. at 19.

Mother next brought C.W. to her scheduled appointment with Dr. Taub on April 9, 2021, when C.W. was slightly more than two months old. *Id*. at 20. C.W. weighed 8 pounds, 3.9 ounces. *Id*. at 21. Mother reported that she was still breast-feeding and "feeding every three to four hours overnight, sometimes longer." *Id*. at 21-22. Dr. Taub testified that Mother reported she tried to introduce the bottle, but "the baby was not accepting the bottle that well." *Id*. at 21. Dr. Taub's office note reflected the child's "poor weight gain, [and] her slowed weight curve." *Id*. at 22. She discussed with Mother adding "more breast-feeding sessions, overnight feedings," using a breast pump, and using formula to supplement because C.W.'s growth was "suboptimal." *Id*. at 22, 24. Dr. Taub testified that Mother expressed no concerns regarding feeding C.W. at the time. *Id*. at 24.

Mother brought C.W. for her third scheduled appointment with Dr. Taub on May 3, 2021, when she was three months old. *Id*. at 24. C.W. weighed 8

pounds, 3.9 ounces, reflecting no change from the previous visit, and the child remained below the first percentile within the growth chart. *Id*. at 25, 29. Dr. Taub testified that Mother "disclosed that she **had not** supplemented formula at that time, as per our previous discussion." *Id*. (emphasis added). At this visit, Dr. Taub diagnosed C.W. with "failure to thrive." *Id*. at 27. She explained that the diagnosis "is a physical manifestation of suboptimal nutrition that can affect the growth and development of a child." *Id*. Dr. Taub testified that she discussed with Mother "the importance of giving formula in a measurement of at least 24 ounces daily." *Id*. She testified that Mother appeared to understand her instructions and did not raise any concerns or issues with accessing formula for C.W. *Id*. at 28.

Both Mother and Father brought C.W. to her next appointment with Dr. Taub one week later, on May 10, 2021. *Id*. at 30. C.W. weighed 8 pounds, 3.2 ounces, reflecting a loss of 0.7 ounces. *Id*. Dr. Taub testified that, at that visit, Parents "were visibly upset and angry, both by their physical body language and . . . their louder voices. They verbalized to me that they felt traumatized from previous [child welfare agency] involvement when their other child was removed from their home." *Id*. at 31. Moreover, Dr. Taub testified that Parents told her "they bought Similac organic" formula, but C.W. "was still not taking bottles from them." *Id*. Nevertheless, Dr. Taub testified that she gave Father a bottle to feed C.W. in the office, and she "observed her taking it very well. She took two ounces of Similac Sensitive. . . . So, that

- 12 -

was reassuring to see." *Id*. at 31-32. According to Dr. Taub, the appointment

proceeded as follows.

> Father agreed to start feeding her formula at a minimum of every
> three hours. I gave more formula samples [to Parents] at that
> visit. I think [M]other was expressing a desire to continue to
> breast-feed, but we [added] formula . . . between [feedings] to
> maximize growth.
>
> We discussed that we had to follow her back in one week[,] and
> we discussed that labs may . . . or a hospital admission have to
> be done for this issue. I wanted them to call me if it wasn't
> working with the formula feedings prior to [the next visit], and the
> family agreed with that plan at that time.

*Id*. at 32. Dr. Taub clarified, "I always discuss the amount that is appropriate,

which is 24 to 30 ounces of formula. I did not note it in my chart, but that is

my recommendation with formula feedings in general." *Id*. at 33.

Parents brought C.W. to the next scheduled appointment on May 17,

2021. *Id*. at 34. C.W. weighed 8 pounds, 7.5 ounces, reflecting a gain of 4

ounces. *Id*. Dr. Taub testified that Parents told her C.W. "was taking 4 ounces

of Similac organic, and they were offering that at least four times a day." *Id*.

at 34. She continued:

> They said it took a few days for her to get used to taking it, but
> now she was taking it well — the bottle, that is — and they were
> seeing an increase in her urine and stool output. She was sleeping
> better, and more alert.
>
> And, at that point, they did voice concern that all three of their
> children did have issues with gaining weight early in infancy, and
> they wanted to explore genetic counseling. . . .
>
> I sent them to Genetics at CHOP for further evaluation.

*Id*. at 35. Dr. Taub testified that, according to Parents, "things were going smoothly," so she scheduled the follow-up visit for two or three weeks, "or sooner, if they had any issues giving her formula in between." *Id*.

Parents brought C.W. for the sixth appointment with Dr. Taub on June 4, 2021. *Id*. at 36-37. C.W. weighed 8 pounds, 13 ounces, reflecting that she had gained approximately 5 ounces. *Id*. at 36. Dr. Taub continued to diagnose C.W. with "failure to thrive." *Id*. at 39. Dr. Taub testified that Parents reported that "[M]other was giving at least 2 ounces of formula — of the Similac organic [formula] — and offering that four to six times per day — no other concern." *Id*. at 37. Dr. Taub testified that this was **less** formula than she had recommended. *Id*. She stated:

> I emphasized giving more formula. I always discuss . . . my goals for . . . formula feeding. So, that 24 ounces is my goal, at minimum. I did discuss adding in some solid foods, as I was trying to add in some calories, some more nutrition for her growth, and then I discussed following up.

*Id*. at 38. Dr. Taub testified that Parents appeared to understand her instructions, and they raised no problems with feeding C.W. *Id*. at 40.

Parents brought C.W. to the next scheduled appointment on July 30, 2021, at which point she was six months old. *Id*. at 41-42. C.W. weighed 8 pounds, 12 ounces, reflecting a one-ounce loss. *Id*. at 42. Dr. Taub testified that Parents reported as follows during this visit:

> [C.W.] was breast-feeding twice a day and giv[en] six-ounce bottles, about five per day, not taking long to feed, taking solids twice a day, tolerating feeds well. They had genetic testing done, but we didn't have the lab work back at that point.

*Id*. at 42.   Nonetheless, Dr. Taub testified that C.W. "didn't appear well.  She was very thin.  She appeared lethargic. . . .  [S]he didn't seem very alert, as in previous visits.  So, I was very concerned for her well-being."  *Id*. at 43.  Dr. Taub further explained that C.W. "was severely malnourished, and she was showing signs that she was dehydrated, and we needed her to be hospitalized. . . ."  *Id*. at 44.  Dr. Taub testified that it was important for C.W. to be monitored in a hospital setting due to "refeeding syndrome," which is caused by "introducing nutrition into someone's body who's been in a state of starvation . . . [and has the] potential for fatal outcomes, such as seizures or heart irregularities[.]" *Id*.  Dr. Taub arranged for C.W. to be directly admitted to Bryn Mawr Hospital; however, she agreed to Parents admitting her the following day so that they had time to make childcare arrangements for their other children.  *Id*. at 43-45.

Based on Parents' report to Dr. Taub at the last visit before C.W.'s hospitalization that they were feeding her "six-ounce bottles, about five per day," *i.e.*, 30 ounces of formula per day, we discern no abuse of discretion in the court's finding that Parents "clearly knew from the doctor the minimum number of ounces that she was looking for [C.W.] to have."  N.T., 6/10/22, at 40.

Further, Dr. Sergonis noted that Parents likewise reported to the hospital that they were feeding C.W. six ounces of Similac Organic formula six

times per day.[3]  N.T., 9/24/21, at 20.  Dr. Sergonis stated that she asked

Mother to confirm that amount and

> Mother thought about it, and she's like, "You know, maybe it's
> more like five . . . bottles a day."  And I said, . . . "Does she ever
> leave anything in the bottle or does she usually drink at all?" And
> she said, "Sometimes maybe she'd leave an ounce or so."

*Id*. at 24.  On direct examination, Dr. Sergonis testified:

> [I]f Mom had been feeding her as she described, [C.W.] would be
> getting about 150 calories per kilogram per day.  And what she
> needed for catch-up growth was like 110.  So if she was getting
> 150, she shouldn't have been where she was at.  And then during
> the hospitalization, . . . we made sure she was at least getting
> 110, but many days she took more [than] that.  **She was just
> guzzling.**  So . . . she gained weight with those higher calories.
> And so . . . it didn't add up that . . . if they were giving that much
> at home [C.W.] should have not been where she was.

*Id*. at 31 (emphasis added).  In fact, Dr. Sergonis testified that C.W. "far

exceeded" the caloric consumption goals set for her in the hospital.  *Id*. at 35-

36.

Dr. Taub's testimony confirmed Dr. Sergonis's observation.  The

following exchange occurred during the September 2021 hearing,

> Q. Do you believe that [M]other and [F]ather followed your
> recommendations of feeding the child from 24 to 30 ounces of
> formula daily?
>
> [Dr. Taub].  No, I do not.
>
> Q. And why don't you believe that?

---

[3] Parents also reported to the hospital that they were feeding C.W. "rice cereal
and baby purees [without] vomiting[.]"  N.T., 9/24/21, at 20.

[Dr. Taub]. [B]ecause it took direct observation to note that . . . with that amount of formula, she did gain weight.

[I]t would have been expected, you know, had they been giving her that amount of formula previously, that she would've gained to the same degree that she did when it was observed by [the hospital].

. . . .

Q. And was it reasonable for [P]arents not to follow your recommendations?

[Dr. Taub]. I do not think that it was, no.

Q. And why not?

[Dr. Taub]. Because it wasn't providing optimal growth for their child . . . and was putting her at risk for developing potentially long-term outcomes — poor outcomes with — like I said previously, with cognition, behavior, and learning difficulties as well.

*Id*. at 53-54. Thus, the testimony by C.W.'s treating physicians supports the court's conclusion that Parents acted with conscious disregard of the substantial and unjustifiable risk of failing to provide C.W. with adequate calories to sustain her life and proper development. This evidence is particularly weighty in light of the fact that Parents' two older children previously endured failure-to-thrive diagnoses while in Parents' care. During that episode, the juvenile court placed the children in protective custody, adjudicated them dependent, and only permitted the children to return home after their conditions improved. N.T., 11/4/21, at 68-69, 77-78. Hence, we reject Parents' instant contention that they acted reasonably to combat C.W.'s

failure to thrive prior to her hospitalization given the information known to them at the time.

Having found the certified record supports the juvenile court's finding of recklessness, we next review the discrete allegations of error that Mother and Father assert separately.

First, Father argues that the only reason that C.W. gained weight while in the hospital was the doctors' decision to adjust the composition of the child's formula. This assertion is misplaced. The hospital was required to alter the formula, not to further supplement the child's nutrition but, because C.W. developed a condition related to her severe malnutrition. Dr. Sergonis explained that, upon consuming the appropriate number of calories, the amount of calcium and phosphorus in C.W.'s system increased to a point where her "kidneys weren't able to handle the load being provided by the formula with those minerals." N.T., 9/24/21, at 28-29. She opined, "the reason [C.W.'s] kidneys were having this issue was because of the malnutrition, that [her kidneys] just weren't functioning as well as they should have." *Id*. Dr. Sergonis further testified that she changed C.W.'s formula to "a low-mineral formula called Similac 60/40. So it's like a medical formula that's lower in those things. And then with that her levels came down nicely." *Id*. Significantly, and contrary to Father's contention, Dr. Sergonis did not indicate that C.W.'s low-mineral formula provided additional nutrition that was not available in the original formula. Hence, there is no evidence to support

- 18 -

the notion that C.W.'s weight gain was related to the new formula, as opposed to the hospital simply feeding the child the appropriate amount of formula per day.

Likewise, for several reasons, the certified record also belies Father's contention that "even upon discharge from the hospital, C.W. remained under the one percentile on the growth/weight chart and C.W. was referred to genetics to follow up with her." Father's brief at 21-22. First, contrary to Father's assertion, Dr. Taub referred the child to "Genetics at CHOP" prior to her hospitalization, and Dr. Sergonis testified that the results of the genetic testing were not received by the time of discharge. N.T., 11/4/21, at 35; N.T., 9/24/21, at 42. Accordingly, the genetic testing was not ordered because of the child's continued failure to thrive. Indeed, both doctors testified that the genetic test results were eventually returned as "normal." *Id*. at 51; N.T., 9/24/21, at 42. Thus, notwithstanding Father's repeated protestations, the certified record is devoid of evidence to support his belief that C.W.'s failure to thrive is a consequence of genetics.

Furthermore, Father's argument simply ignores the fact that C.W. continued to progress after her discharge from the hospital on August 5, 2021. N.T., 11/4/21, at 59. C.W.'s foster parents brought the child to Dr. Taub four days after discharge and she weighed 10 pounds, 10.7 ounces, which reflected a gain of two pounds since July 30, 2021. *Id*. at 46-47. Dr. Taub testified that the foster parent reported C.W. "was taking at least 30 ounces per day,

up to eight ounces per feeding. . . . [C.W.] was sleeping at night. . . . [W]hile [C.W.] was awake, . . . she noticed that she was more alert and interactive." *Id*. at 47-48. The foster parent brought C.W. to her next appointment with Dr. Taub on August 20, 2021, and the child weighed 11 pounds, 14 ounces, which reflected an additional gain of one pound, three ounces. *Id*. at 50. In addition, the child's development was beginning to show improvement. Dr. Taub testified that C.W. was "starting to do more motor skills, starting to grasp — rolling, holding objects, but not bearing weight . . . on her legs." *Id*. at 50-51. Dr. Taub continued that C.W. "appeared well. She appeared more alert." *Id*. at 51. Thus, considering the foregoing evidence, Father's claim that C.W.'s health condition did not improve when she received consistent feedings is wholly unsupported by the record.

Finally, we address Mother's allegations of error, and reject them for the following reasons. Mother relies upon *A.B. v. Department of Public Welfare*, 869 A.2d 1129 (Pa.Cmwlth. 2005), for the proposition that "even if a parent is improperly feeding a child with an awareness they are doing so, that, in and of itself, is not sufficient for a finding of child abuse based on failure to thrive." Mother's brief at 24. In *A.B.*, the Commonwealth Court reversed an adjudication of the Department of Public Welfare denying the mother's request to expunge a report of indicated child abuse of her then

three-month-old child.[4]  In that case, the record evidence indicated that the child's actual weight loss between her first and fifth and final visit with the pediatrician was only two ounces.  The Commonwealth Court held that the child's "two[-]ounce weight loss [between September 2001 through December 10, 2001] without other medical problems was not sufficiently significant to be characterized as 'failing to thrive' while in [the mother]'s custody as a result of being deprived of the 'essentials of life.'"  *Id*. at 1133.  The Court further found, "This cannot be deemed a significant loss, considering that [the child] was born prematurely, weighed only 4 pounds, 8 and ½ ounces at birth, and remained hospitalized for several weeks before being released into [the mother]'s custody."  *Id*.  In contrast, in this case, between C.W.'s first and final visit with Dr. Taub before her admission into the hospital, the child failed to gain appropriate weight and was diagnosed with failure to thrive due to severe malnutrition and developmental delay.  Hence, Mother's reliance on *A.B.* is unavailing.

Accordingly, we affirm the order finding C.W. a victim of child abuse and Parents the perpetrators pursuant to § 6303(b.1)(7) of the CPSL.

Order affirmed.

_____

[4] The mother requested that the indicated report be expunged pursuant to § 6341(a)(2), which has since been amended.

- 21 -

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/17/2023</u>